2016 IL App (3d) 150311WC

FILED: June 28, 2016

NO. 3-15-0311WC

IN THE APPELLATE COURT

OF ILLINOIS

THIRD DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| CORN BELT ENERGY CORP., | ) | Appeal from |
| Appellant, | ) | Circuit Court of |
| | ) | Bureau County |
| v. | ) | No. 14MR37 |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al*. (James Lind, Appellee). | ) | Honorable |
| | ) | Cornelius J. Hollerich, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion
Presiding Justice Holdridge and Justices Hudson and Stewart concurred in the judgment and opinion.
Justice Hoffman specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        In November 2012, claimant, James Lind, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2010)), seeking benefits from the employer, Corn Belt Energy Corp.  Following a hearing, the arbitrator determined claimant sustained accidental injuries that arose out of and in the course of his employment on August 30, 2012, and awarded claimant (1) medical expenses of $1,480 less credits to the employer of $390.91 and $536 for amounts paid by its workers' compensation carrier and claimant's group health insurance and (2) 15 weeks' permanent partial disability (PPD) benefits for a 3% loss of the person as a whole.

¶ 2 On review, the Illinois Workers' Compensation Commission (Commission), with one commissioner dissenting, modified portions of the arbitrator's decision but otherwise affirmed and adopted his award. On judicial review, the circuit court of Bureau County confirmed the Commission.

¶ 3 The employer appeals, arguing (1) the Commission erred in finding claimant's condition of ill-being was causally connected to his work accident, (2) the Commission erred in awarding claimant PPD benefits where he failed to introduce into evidence a PPD impairment report as described in section 8.1b(a) of the Act (820 ILCS 305/8.1b(a) (West 2012)), and (3) the Commission's PPD award must be reversed because it failed to adequately address the remaining factors identified in section 8.1b(b) of the Act (820 ILCS 305/8.1b(b) (West 2012)) for establishing a PPD award. We reverse the portion of the circuit court's judgment confirming the Commission's award of PPD benefits and remand to the Commission for compliance with section 8.1b(b) of the Act. We otherwise affirm the circuit court's judgment.

¶ 4 I. BACKGROUND

¶ 5 At arbitration, claimant testified he worked for the employer for eight years. At the time of his alleged accident, August 30, 2012, he worked for the employer as a lineman. His job duties included "[a]nything from working out of a bucket truck to climbing a pole" and working with high voltage wires. On the day of his accident, claimant's job duties required him to string three spans of primary wire to a transformer in the backyard of a residence. Upon arriving at the job site, he parked his work truck in a ditch on an angle. When claimant exited the truck he "had to twist and rotate out" and "felt a pull in [his] back." He immediately reported to his foreman that he had "pulled something" but continued to work.

¶ 6 Claimant testified his pain and discomfort persisted. The following day, he

sought chiropractic care at Farrell Chiropractic Clinic with Dr. Dennis Farrell. He testified his pain and discomfort was primarily located in his lower back but he also experienced some pain and discomfort in his cervical spine as a result of his work accident. Claimant rated his pain as an eight or nine "because [he] was having problems walking." He stated Dr. Farrell took an x-ray and provided him with lower back adjustments. Claimant testified he continued to follow up with Dr. Farrell, initially seeing him every day or every other day. However, as his symptoms reduced, so did his follow-up appointments.

¶ 7       Claimant believed the chiropractic care he received was helpful but stated he continued to experience pain and discomfort in his lower back. On direct examination, he agreed that if Dr. Farrell noted the pain was primarily in his right lower lumbar region and right hip area he would be correct. Further, claimant agreed that when he last saw Dr. Farrell he was experiencing pain which he rated at a 5 on a 10 point scale.

¶ 8       Claimant further testified that he continued to work following his accident. He stated he felt capable of performing his work with discomfort. Currently, he noticed that his lower back "stiffens up" on a daily basis. The stiffening he experienced was also accompanied by pain from time to time. He testified that "[p]robably every day" he experienced "some sort of pain or tightness in his lower back." Claimant stated his symptoms did not hinder his work. He noted he had taken a different job with the employer and currently worked as a serviceman, which did not require him to perform as much lifting or put as much stress on his body. Claimant's current rate of pay was also higher.

¶ 9       Claimant denied experiencing any problems with the parts of his body that were injured as a result of his work accident in the week before his accident occurred. However, on cross-examination, claimant acknowledged that he received treatment from Dr. Farrell prior to

August 2012.  Specifically, he recalled seeing Dr. Farrell in May 2009, in connection with complaints of pain and paresthesia in his neck, stating he fell off of a roof and landed on his head.  Claimant testified he did not specifically recall various other appointments with Dr. Farrell from 2010 through July 2012.  However, he generally stated he could not disagree with what Dr. Farrell's records showed about the complaints he made or the treatment he received during that time.

¶ 10        At arbitration, claimant submitted his chiropractic treatment records from August 31, 2012, the day following his accident, through April 24, 2013, while the employer submitted claimant's chiropractic treatment records from May 2009, through December 2012.  Those records show that, prior to his alleged August 2012 work accident, claimant was seen at Farrell Chiropractic Clinic on multiple occasions, spanning from May 1, 2009, through July 6, 2012.  Specifically, he sought treatment at Farrell Chiropractic Clinic 12 times in 2009; 22 times in 2010; 32 times in 2011; and 8 times between January and July 2012.  During those visits, claimant made various back-related complaints, reporting "pain and/or paresthesias" in his cervical, thoracic, and lumbar spine.

¶ 11        The record reflects claimant sought chiropractic care twice in January 2012.  On January 6, 2012, he complained of "pain and/or paresthesia" in the center of his lower lumbar spine and right upper neck, as well as pain in his mid thoracic spine.  On January 31, 2012, he reported "pain and/or paresthesia" in the center of his lower lumbar spine, the center of his lower neck, and the center of his upper and mid thoracic spine.  Claimant also sought chiropractic care twice in February 2012.  On February 13, 2012, he complained of "pain and/or paresthesia" in his neck and the center of his lower lumbar spine, as well as pain in his mid thoracic spine.  On February 28, 2012, he reported "pain and/or paresthesia" generally throughout his entire neck and pain in his mid thoracic and lumbar spine.

¶ 12        Thereafter, claimant was seen at Farrell Chiropractic Clinic once per month from April to July 2012. During visits on April 24, May 25, and June 1, 2012, he complained of "pain and/or paresthesia" in the center of his lower lumbar spine and in his thoracic spine, as well as pain in his cervical spine or neck. On July 6, 2012, his last appointment prior to his alleged work accident, claimant saw Dr. Farrell and reported "pain and/or paresthesia" in the center of his lower lumbar spine. Further, Dr. Farrell noted as follows:

> "Pain/paresthesia is mild, intermittent[,] and aching. The pain remains localized, it does not radiate or travel to any other parts of the body. On a scale of 0 to 10 with 10 being the worst, [claimant] rates the pain/discomfort a 2 of 10. Since the last treatment, his low back pain is some better."

¶ 13        In providing treatment to claimant on July 6, 2012, Dr. Farrell noted an "electronic thermal test" performed on claimant detected "imbalances" due to "subluxation" at the C2, C6, T4, and L5 levels of claimant's spine. He recommended claimant return for treatment once a week for the next month; however, the record reflects claimant did not seek further chiropractic care until nearly two months later on August 31, 2012, the day after his alleged work accident.

¶ 14        Dr. Farrell's records from August 31, 2012, document the following complaints and findings:

> "Subjective:
>
> Pain and/or paresthesia in the center of the lower lumbar spine and in the left lower lumbar region. Pain began [on August 30, 2012]. The pain and/or paresthesia radiates into the left knee and down the lateral side of the left calf, where it is described as [a] constant

ache that can be sharp at times. Pain and/or paresthesia generally throughout the entire neck. Pain/paresthesia is moderate, intermittent, soreness[,] and stiffness. Secondary complaint of pain in the following region(s): mid thoracic spine.

* * *

Assessment:

[Claimant] reports feeling better for a while after the last treatment, but says the pain/paresthesia has manifested again. [Claimant] has had an exacerbation. This is an episodic marked deterioration of the patient's condition due to an acute flareup of the presenting conditions."

¶ 15    In September 2012, claimant returned to see Dr. Farrell a total of nine times. On September 5, 2012, Dr. Farrell documented complaints of "pain and/or paresthesia" in the center of claimant's lower lumbar spine but noted claimant was "some better" since his last treatment. Claimant rated his pain and discomfort as a 5 out of 10 and stated he noticed discomfort "55% of [his] awake time." He further complained that his pain increased when moving from sitting or laying down to standing and asserted his "pain/paresthesia [was] a constant ache that [could] be sharp at times." Finally, claimant also reported experiencing pain in his mid thoracic and cervical spine.

¶ 16    On September 7, 2012, claimant followed up with Dr. Farrell and raised complaints of "pain and/or paresthesia" in the center of his lower lumbar spine. Again, Dr. Farrell noted claimant's pain was "some better." Claimant rated his pain and discomfort as a 4 out of 10 and stated he noticed discomfort "50% of [his] awake time." He reported his pain increased

when lying down and decreased when walking. Additionally, he complained of pain in his mid thoracic and cervical spine.

¶ 17     Claimant's chiropractic records from September 10, 2012, contain a history of his alleged work accident, stating as follows:

"Pain and/or paresthesia in the center of the lower lumbar spine. The pain began [on August 30, 2012]. [Claimant] [w]as getting out of his work truck and twisted. Felt pain after that but it was not too bad. When he woke up the next morning, he had severe pain. Pain/paresthesia is moderate, intermittent[,] and sharp. On a scale of 0 to 10 with 10 being the worst, he rates the pain/discomfort a 4 of 10. Was having pain down the back of the left leg to the knee, but that is gone now. Worse in the mornings. If he sits or drives for too long then tries to get up and get moving, the pain is really bad. Sleeping fine."

Dr. Farrell found and adjusted subluxations at the L5, L1, T4, and C6 levels of claimant's spine.

¶ 18     Claimant continued to seek treatment at Farrell Chiropractic Clinic through April 2013. As stated, he was seen a total of nine times in September 2012. Claimant also returned for follow up appointments six times in October 2012, once in November 2012, once in December 2012, twice in January 2013, once in February 2013, five times in March 2013, and three times in April 2013. He reported similar symptoms of "pain and/or paresthesia" in various parts of his spine. Also, during visits in September and October 2012 he reported "pain and/or paresthesia" in the center of his lower lumbar spine that "[t]ravels into the SI joints."

¶ 19     In March and April 2013, claimant began reporting "pain and/or paresthesia" in

the center of his lower lumbar spine that radiated into his right hip and right hip socket or into his right gluteus. Claimant also described his pain as radiating down the front of his right thigh and into his right knee and down the front of his right calf. At the time of his last visit with Dr. Farrell on April 24, 2013, subluxations at the L5, T4, and C2 levels of claimant's spine were discovered and adjusted. Dr. Farrell noted claimant reported "feeling better for a while after the last treatment" but his pain and paresthesia had "manifested again." Further, he stated claimant "continue[d] to struggle with pain, discomfort[,] and limitations while at work and performing activities of daily living."

¶ 20      On November 4, 2013, the arbitrator issued his decision in the matter, finding claimant sustained accidental injuries arising out of and in the course of his employment on August 30, 2012. The arbitrator determined claimant's "injury was in the form of a cervical, thoracic[,] and lumbar strain along with subluxations throughout his spine." Further, he concluded claimant's current condition of ill-being was "causally related to the injury." The arbitrator awarded claimant (1) medical expenses of $1,480 minus credits to the employer of $390.91 and $536 for amounts paid by its workers' compensation carrier and claimant's group health insurance and (2) 15 weeks' PPD benefits for a 3% loss of the person as a whole.

¶ 21      On August 1, 2014, the Commission issued its decision in the matter. It modified the arbitrator's decision by addressing section 8.1b of the Act (820 ILCS 305/8.1b (West 2012)) in connection with the arbitrator's PPD award but otherwise affirmed and adopted the arbitrator's decision and award of benefits. One commissioner dissented, finding claimant was entitled to PPD benefits for only a 1% loss of the person as a whole.

¶ 22      The employer sought judicial review with the circuit court. On April 20, 2015, the court confirmed the Commission's decision.

¶ 23        This appeal followed.

¶ 24                        II. ANALYSIS

¶ 25                    A.  Causal Connection

¶ 26        On appeal, the employer first challenges the Commission's decision as to causal connection.  It argues the Commission's finding of a causal connection between the accident and the condition complained of is both contrary to law and against the manifest weight of the evidence.

¶ 27        "To obtain compensation under the Act, a claimant bears the burden of showing, by a preponderance of the evidence, that he has suffered a disabling injury which arose out of and in the course of his employment."  *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 671 (2003).  "The 'arising out of' component is primarily concerned with causal connection" and, to satisfy that requirement, a claimant must show "that the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury."  *Id*. at 203, 797 N.E.2d at 672.

¶ 28        A claimant may be entitled to benefits under the Act even though he suffers from a preexisting condition of ill-being.  *Id*. at 205, 797 N.E.2d at 672-73.  "[I]n preexisting condition cases, recovery will depend on the employee's ability to show that a work-related accidental injury aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to have been causally connected to the work-related injury and not simply the result of a normal degenerative process of the preexisting condition."  *Id*. at 204-05, 797 N.E.2d at 672.  "Accidental injury need not be the sole causative factor, nor even the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being." (Emphasis in original.)  *Id*. at 205, 797 N.E.2d at 673.

¶ 29        Additionally, "medical evidence is not an essential ingredient to support the conclusion of the *** Commission that an industrial accident caused the [claimant's] disability." *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 63, 442 N.E.2d 908, 911 (1982); see also *Pulliam Masonry v. Industrial Comm'n*, 77 Ill. 2d 469, 471, 397 N.E.2d 834, 835 (1979) ("It is not necessary to establish a causal connection by medical testimony."). "A chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient circumstantial evidence to prove a causal nexus between the accident and the employee's injury." *International Harvester*, 93 Ill. 2d at 63-64, 442 N.E.2d at 911.

¶ 30        "It is within the province of the Commission to resolve disputed questions of fact ***, to draw permissible inferences from the evidence, and to judge the credibility of the witnesses." *National Freight Industries v. Workers' Compensation Comm'n*, 2013 IL App (5th) 120043WC, ¶ 26, 993 N.E.2d 473. "Whether a causal connection exists is a question of fact for the Commission, and a reviewing court will overturn the Commission's decision only if it is against the manifest weight of the evidence." *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592, 834 N.E.2d 583, 592 (2005). "For the Commission's decision to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result." *Id.* "The relevant inquiry is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other might reach an opposite conclusion." *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 538-39, 865 N.E.2d 342, 353 (2007).

¶ 31        Initially, the employer argues the Commission erred in finding the existence of a casual connection because claimant failed to present any medical opinion evidence and, as a matter of law, a "chain of events" theory of causation "should not be available to a claimant who has

an unwitnessed accident and a preexisting condition involving the same area of the body for which he now claims injury." We note the employer has failed to cite any authority to support its position. Additionally, this court has previously addressed and rejected a substantially similar argument. Specifically, in *Price v. Industrial Comm'n*, 278 Ill. App. 3d 848, 853-54, 663 N.E.2d 1057, 1060-61 (1996), we held as follows:

> "With respect to the Commission's 'chain of events' analysis, the employer acknowledges that a finding of causal connection can be made based solely on a claimant's testimony, without supporting medical evidence, but contends that in the present case such finding was made in the face of medical evidence to the contrary. While there is medical evidence of a preexisting condition, there is no medical evidence precluding an inference that such preexisting condition was aggravated by [the claimant's] accident. Indeed, contrary to the employer's assertions, there is medical evidence to support it. The employer also contends that the facts of the present case do not support the Commission's 'chain of events' analysis because [the claimant] had a preexisting condition. The employer cites no authority for the proposition that a 'chain of events' analysis cannot be used to demonstrate the aggravation of a preexisting injury, nor do we see any logical reason why it should not. *The rationale justifying the use of the 'chain of events' analysis to demonstrate the existence of an injury would also support its*

- 11 -

*use to demonstrate an aggravation of a preexisting injury.*"  (Emphasis added.)

¶ 32      We continue to adhere to the rationale set forth in *Price* and reject the employer's contention that, as a matter of law, causation must be supported by medical opinion evidence rather than a "chain of events" theory in preexisting injury cases.  Further, we note that although the employer emphasizes in its argument on appeal that claimant's accident was unwitnessed, it does not challenge that an accident occurred in the course of claimant's employment on August 30, 2012.  Under such circumstances, whether claimant's accident was witnessed or unwitnessed does not change our analysis of the causation issue actually presented and argued by the employer.

¶ 33      On appeal, the employer also contends the Commission's causal connection finding was against the manifest weight of the evidence.  It notes claimant's chiropractic records demonstrate that claimant had "a significant preexisting condition involving the same area of the body, and involving the same modes of treatment."  Again, it maintains claimant should have "come forth with medical opinion testimony—rather than simply rely upon the chain of events theory—to establish his burden of proof."

¶ 34      We find the employer's arguments on appeal ignore that a claimant may obtain compensation under the Act even when he suffers from a preexisting condition of ill-being.  As discussed, recovery in such cases depends upon the claimant's ability to establish that his work-related accident aggravated or accelerated his preexisting condition.  Further, causation in preexisting injury cases may be established without medical opinion evidence and through circumstantial evidence, *i.e.*, a chain of events.  Here, the record undoubtedly shows claimant had a preexisting back condition of ill-being for which he sought chiropractic care from May 2009 through

July 2012. However, it also shows that after his work accident, claimant's chiropractic visits increased significantly, he reported different symptoms, and Dr. Farrell documented a deterioration of his previous condition.

¶ 35       Prior to his work accident, the frequency of claimant's chiropractic visits varied. During the first half of 2012, he sought chiropractic treatment only eight times and, from April to July 2012, was seen for chiropractic care once per month. After his accident, claimant visited Farrell Chiropractic Clinic total of 18 times from August 31 to December 12, 2012.

¶ 36       Additionally, during the last chiropractic visit prior to his work accident on July 6, 2012, claimant reported lumbar pain that he rated as a 2 out of 10 and which Dr. Farrell noted did not radiate or travel to any other parts of claimant's body. Claimant reported feeling better since his last treatment and did not seek any further chiropractic care until after his work accident, almost two months later. Following his August 2012 accident, claimant reported pain radiating to his left lower extremity; pain that traveled to the SI joints; and, later, pain radiating to his right lower extremity. In its reply brief, the employer argues claimant previously reported pain radiating to his left lower extremity when seeking chiropractic care prior to his work accident; however, such complaints occurred on only two occasions in August 2011 and once in December 2011. Claimant's medical records thereafter indicate such complaints resolved until after his August 2012 work accident. Finally, on August 31, 2012, the day after his work accident, Dr. Farrell documented that claimant "report[ed] feeling better for a while after the last treatment" but his "pain/paresthesia ha[d] manifested again." He noted claimant had an "exacerbation" that was "an episodic marked deterioration of [his] condition due to an acute flareup of the presenting conditions."

¶ 37       Based on the circumstances presented, we find the record contains sufficient evi-

dence to show claimant's work accident aggravated his preexisting back condition of ill-being and supports the Commission's decision as to causation. An opposite conclusion from that of the Commission is not clearly apparent and its causal connection decision is not against the manifest weight of the evidence.

¶ 38    We note, the employer also challenges the Commission's decision on the basis that claimant's testimony lacked credibility. However, we find claimant's testimony regarding his work accident and resulting symptoms was corroborated by his chiropractic records. Additionally, although he could not recall specific chiropractic visits that occurred prior to his work accident or specific back-related complaints he had over the years, he acknowledged his previous care and generally agreed that he received the care and treatment reflected in his medical records. Finally, we note credibility determinations are within the province of the Commission and we find nothing in claimant's testimony which warrants a different result from that reached by the Commission in this case.

¶ 39                          B.  PPD Benefits

¶ 40    On appeal, the employer alternatively challenges the Commission's award of PPD benefits. It argues the Commission's award should be set aside due to noncompliance with section 8.1b of the Act (820 ILCS 305/8.1b (West 2012)). Specifically, the employer contends claimant failed to introduce into evidence a PPD impairment report as described in section 8.1b(a) of the Act and the Commission failed to adequately address the remaining factors for consideration identified in section 8.1b(b).

¶ 41    The issues presented involve matters of statutory construction, which are subject to *de novo* review. *Cassens Transport Co. v. Industrial Comm'n*, 218 Ill. 2d 519, 524, 844 N.E.2d 414, 418 (2006). "In interpreting the Act, our primary goal is to ascertain and give effect

to the intent of the legislature." *Id*. at 524, 844 N.E.2d at 419. "The language used in the statute is normally the best indicator of what the legislature intended" and "[e]ach undefined word in the statute must be given its ordinary and popularly understood meaning." *Gruszeczka v. Workers' Compensation Comm'n*, 2013 IL 114212, ¶ 12, 992 N.E.2d 1234. "[W]here the statutory language is clear, it will be given effect without resort to other aids for construction." *Id*.

¶ 42         Section 8.1b of the Act (820 ILCS 305/8.1b (West 2012)) provides as follows with respect to the determination of PPD benefits:

> "For accidental injuries that occur on or after September 1, 2011, [PPD] shall be established using the following criteria:
>
> (a) A physician licensed to practice medicine in all of its branches preparing a [PPD] impairment report shall report the level of impairment in writing. The report shall include an evaluation of medically defined and professionally appropriate measurements of impairment that include, but are not limited to: loss of range of motion; loss of strength; measured atrophy of tissue mass consistent with the injury; and any other measurements that establish the nature and extent of the impairment. The most current edition of the American Medical Association's [(AMA's)] 'Guides to the Evaluation of Permanent Impairment' shall be used by the physician in determining the level of impairment.
>
> (b) In determining the level of [PPD], the Commission shall base its determination on the following factors: (i) the reported level of impairment pursuant to subsection (a); (ii) the occupation of the in-

jured employee; (iii) the age of the employee at the time of the injury; (iv) the employee's future earning capacity; and (v) evidence of disability corroborated by the treating medical records. No single enumerated factor shall be the sole determinant of disability. In determining the level of disability, the relevance and weight of any factors used in addition to the level of impairment as reported by the physician must be explained in a written order."

¶ 43       The employer first argues section 8.1b of the Act "imposes a requirement that the claimant tender an AMA rating report."  It maintains that because claimant presented no "AMA rating report" in the case at bar he failed to satisfy section 8.1b's requirements and was not entitled to a PPD award.

¶ 44       In addressing this issue, the Commission stated as follows:

"The Commission finds that a complete reading of *** section [8.1b] of the Act indicates that a party is not required to provide an AMA rating report for the purpose of determining permanent disability.  Instead, we find that the Act simply requires that if an AMA rating report has been provided, then the Commission must consider it, along with all the other criteria listed, when determining permanent disability."

(We note both the employer and the Commission refer to the report referenced in section 8.1b as an "AMA rating report"; however, consistent with the language of section 8.1b(a), we, hereinafter, refer to the report as a "[PPD] impairment report.")  We find the Commission's interpretation of section 8.1b is reasonable.

¶ 45 First, subsection (a) of section 8.1b is addressed *only* to a "physician *** preparing a [PPD] impairment report." 820 ILCS 305/8.1b(a) (West 2012). It sets forth what a physician should include in his or her report and establishes that the report must be "in writing." *Id*. Subsection (a) does not contain any language which obligates either a claimant or an employer to submit a PPD impairment report. Additionally, it contains no language limiting the Commission's ability to award PPD benefits when no report is submitted.

¶ 46 Second, subsection (b) of section 8.1b of the Act is addressed *only* to the Commission. 820 ILCS 305/8.1b(b) (West 2012). It lists five factors upon which the Commission must base its determination of the level of PPD benefits to which a claimant is entitled, including (1) the level of impairment contained within a PPD impairment report, (2) the claimant's occupation, (3) the claimant's age at the time of injury, (4) the claimant's future earning capacity, and (5) evidence of disability corroborated by the treating medical records. *Id.* In subsection (b), the legislature expressly directed that the Commission not consider any single enumerated factor to "be the sole determinant of disability." *Id*. Further, it sets forth the requirement that the Commission explain in writing the relevance and weight of factors it used to determine the level of impairment in addition to the level of impairment contained within a physician's PPD impairment report. *Id*. Again, subsection (b) does not require any action to be taken by either a claimant or an employer. Also, similar to subsection (a), it contains no language limiting the Commission's ability to award PPD benefits in the absence of a PPD impairment report.

¶ 47 Clearly, the plain language of section 8.1b places no explicit requirement on either party. Nor does it make the submission of a PPD impairment report a prerequisite to an award of PPD benefits by the Commission. Rather, the section speaks in terms of what factors the Commission is required to consider when determining the appropriate level of PPD.

¶ 48 We note this construction of the Act is consistent with our recent decision in *Continental Tire of the Americas, LLC v. Illinois Workers' Compensation Comm'n*, 2015 IL App (5th) 140445WC. In that case, the claimant was awarded PPD benefits based on a 5% loss of use of his left hand. *Id*. ¶ 8. However, only the employer submitted the PPD impairment report described in section 8.1b(a) of the Act and its report contained a 0% impairment rating. *Id*. ¶ 15. On review, the employer asked this court to "hold that the claimant was required under section 8.1b to submit a [PPD impairment] report in support of his disability." *Id*. This court rejected the employer's request, stating as follows:

> "The statute does not require the claimant to submit a written [PPD impairment] report. It only requires that the Commission, in determining the level of the claimant's permanent partial disability, consider a report that complies with subsection (a), regardless of which party submitted it. In addition, section 8.1b does not specify the weight that the Commission must give to the [PPD impairment] report. Instead, section 8.1b(b) states that '[n]o single enumerated factor shall be the sole determinant of disability.' 820 ILCS 305/8.1b(b) (West 2012)." *Id*. ¶ 17.

¶ 49 Under the Act, a PPD impairment report may be submitted by either party. Further, when one is admitted into evidence, it must be considered by the Commission, along with other identified factors, in determining the claimant's level of PPD. None of the factors set forth in section 8.1b is to be the sole determinant of the claimant's disability. Further, nothing in the plain language of the Act precludes a PPD award when no PPD impairment report is submitted by either party. Consequently, we reject this contention by the employer.

¶ 50       Finally, on appeal, the employer argues the Commission failed to comply with section 8.1b(b) by failing to explain the relevance and weight of the factors it used to determine claimant's level of disability.  We agree.

¶ 51       As stated, section 8.1b(b) sets forth various factors the Commission must consider when determining the claimant's level of PPD, including "(ii) the occupation of the injured employee; (iii) the age of the employee at the time of the injury; (iv) the employee's future earning capacity; and (v) evidence of disability corroborated by the treating medical records."  820 ILCS 305/8.1b(b) (West 2012).  That section also provides that "[i]n determining the [claimant's] level of disability, *the relevance and weight of any factors used* in addition to the level of impairment as reported by the physician *must be explained in a written order*."  (Emphases added.)  *Id*.

¶ 52       Here, when awarding PPD benefits, the Commission set forth each of the aforementioned factors in its decision along with the basic facts applicable to each factor.  However, the Commission did not explain the relevance or weight it attributed to each factor when determining claimant's level of disability.  Thus, we find the Commission failed to comply with section 8.1b(b) of the Act.  We reverse the Commission's PPD award and remand for compliance with the Act's requirements.

¶ 53                          III. CONCLUSION

¶ 54       For the reasons stated, we reverse the portion of the circuit court's judgment confirming the Commission's award of PPD benefits and remand to the Commission for compliance with section 8.1b(b) of the Act.   We otherwise affirm the circuit court's judgment.

¶ 55       Affirmed in part and reversed in part; cause remanded.

¶ 56        JUSTICE HOFFMAN, specially concurring in part and dissenting in part:

¶ 57        I concur in that portion of the majority's judgment which reverses that part of the circuit court's order which confirmed the Commission's award of permanent partial disability (PPD) benefits.  I also concur in the majority's finding with respect to causation and its affirmance of that part of the circuit court's order which confirmed the Commission's award of medical expenses.  However, I write separately in order to register my disagreement with that portion of the majority's opinion which holds that section 8.1b of the Act does not require the filing of a PPD impairment report before the Commission can award PPD benefits and to dissent from that portion of the majority's judgment which remands this matter back to the Commission.

¶ 58        The majority takes the position that section 8.1b does not require the filing of a PPD impairment report which the Commission must consider before awarding PPD benefits and that the statute only requires the Commission to consider such a report if one is submitted.  I disagree.

¶ 59        As the majority correctly holds, the cardinal rule of statutory interpretation is to ascertain and give effect to the intent of the legislature.  *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n,* 2015 IL 117418, ¶ 20.  The best evidence of the legislature's intent is the language of the statute itself.  *Id.* ¶ 21.  When the language of a statute is clear and unambiguous, the statute must be given effect without resort to other aids for construction.  *Id*.

¶ 60        Section 8.1b provides that, "[f]or accidental injuries occurring on or after September 1, 2011, permanent partial disability *shall* be established" using the criteria set forth in the statute.  (Emphasis added.)  820 ILCS 305/8.1b (West 2012).  Subsection (b) states unambiguously that, in determining the level of PPD, "the Commission *shall* base its determination" on five enumerated factors, one of which is the reported level of impairment pursuant to subsection

(a) of the statute which sets for the required contents of a PPD impairment report. (Emphasis added.) 820 ILCS 305/8.1b(b) (West 2012). I do not believe it is possible for the Commission to base its PPD determination on the five enumerated factors unless it has considered each of those factors, including a PPD impairment report. Had the legislature intended to make the Commission's consideration of a PPD impairment report mandatory only in those cases where such a report is introduced in evidence, it could have said so. Instead, the legislature enumerated the reported level of impairment" as one of the five factors that the Commission "shall base its determination on." 820 ILCS 305/8.1b(b) (West 2012). Although the level of impairment set forth in a PPD impairment report is not the sole determinant of disability, I believe that the statute requires that one be in evidence and considered by the Commission in determining the level of PPD. My conclusion in this regard is supported by the last sentence in section 8.1 b(b) which states that "[i]n determining the level of disability, the relevance and weight of any factors used in addition to the level of impairment as reported by the physician must be explained in a written order." 820 ILCS 305/8.1b(b) (West 2012). I believe that this sentence clearly requires that the level of impairment as reported by a physician must always be considered in determining a claimant's level of impairment and the weight and relevance of the other four factors for consideration must be explained by the Commission.

¶ 61      My reading of section 8.1b of the Act leads me to conclude that, before the Commission can award PPD benefits, it must consider a PPD impairment report prepared in accordance with the requirements of section 8.1b(a). Stated otherwise, in the absence of its consideration of a PPD impairment report prepared in accordance with the requirements of section 8.1b(a), the Commission may not award PPD benefits. That is not to say that the level of impairment reported in a PPD impairment report is determinative of the issue. I conclude only that such a re-

port must be submitted to the Commission, and the Commission must consider it before making a PPD award.

¶ 62     In this case, no PPD impairment report was presented to the Commission for its consideration. Consequently, I too believe that the portion of the circuit court's order affirming the Commission's PPD award must be reversed.  However, unlike the majority, I would not remand the matter back to the Commission; I would vacate the PPD award.