LAND AND LAKES COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Rocco P. Dawson, Appellee).

Second District (Illinois Workers' Compensation Division)
No. 2—04—0674WC

Opinion filed August 17, 2005.

584

DONOVAN, J., specially concurring.

Richard W. Ross, of Grant, Ross, Fanning & Pittman, of Chicago, for appellant.

John J. Rizzo, of Linn & Campe, Ltd., of Waukegan, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

# I. INTRODUCTION

After slipping and falling while working for employer, Land and Lakes Company, claimant, Rocco P. Dawson, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 et seq. (West 2000)). An arbitrator found that claimant's back condition was causally related to his work accident, awarded claimant 67 1/7 weeks of temporary total disability (TTD) benefits and $17,676 in medical expenses, and ordered employer to pay for the surgery that claimant's treating physician prescribed. The Industrial Commission[1] (Commission) adopted the arbitrator's decision. On judicial review, the trial court confirmed the Commission's decision.

On appeal, employer argues that (1) the arbitrator and the Commission erred in admitting claimant's medical bills because claimant failed to lay a proper foundation for their introduction; (2) the Commission's finding that claimant's condition of ill-being is causally connected to claimant's work injury is against the manifest weight of the evidence; (3) the Commission's award of medical expenses is against the manifest weight of the evidence; (4) the Commission's award of prospective medical care is against the manifest weight of the evidence; and (5) the Commission's TTD award is against the manifest weight of the evidence. We agree with employer that claimant's medical bills should not have been admitted. Therefore, we reverse the medical expenses award and remand the cause for another hearing on that issue. We affirm the Commission's decision in all other respects.

# II. BACKGROUND

The arbitration hearing took place on September 20 and October 24, 2002. Claimant testified that he worked for employer as a machine operator. At the time of the accident, claimant was 65 years old, lived in Harvard, and was working at a site in Lincolnshire. Before the accident, claimant had experienced no problems with his back. On June 7, 2001, claimant was walking along an earthen ramp on a hill. While attempting to walk around a machine, he lost his footing and fell 10 to 12 feet down the slope of the hill. Claimant immediately felt pain in

---

[1]Renamed the Illinois Workers' Compensation Commission. See Pub. Act 93—721, eff. January 1, 2005.

his lower back, numbness in both legs from the knees down, and tingling in both hands. Claimant reported the incident to his foreman, who sent claimant to the emergency room. Claimant had X rays taken and received pain medication.

The following day, claimant saw Dr. Robert Nixon, who ordered an MRI. Claimant saw Dr. Nixon again on June 13, 2001. Dr. Nixon diagnosed a lumbar strain with some neurologic symptoms but with no deficit or clear radicular pattern. He prescribed anti-inflammatory medication and physical therapy and authorized claimant to do sedentary work involving limited walking, no repeated bending, and no lifting of more than 20 pounds.

On June 18, 2001, claimant received from employer a letter directing him to report for work as an office clerk at employer's main office in Park Ridge. Claimant testified that Park Ridge was approximately 70 miles from his home. At the time, he was taking Darvocet, and Dr. Nixon had instructed him not to drive for more than 10 to 15 minutes and not to drive while taking medication.

On June 22, 2001, Dr. Nixon revised claimant's work restrictions to include no sitting for more than about 30 minutes. On June 25, 2001, claimant underwent an MRI, which revealed degenerative disc disease at L3-L4, a right-sided paramedian disc herniation at L4-L5, and a central disc herniation at L5-S1. Neither condition appeared to be impacting upon the dural sac. However, the combination of disc bulges, reduction of disc height, and hypertrophic posterior facets was tightening the L4 and L5 neural foramina bilaterally, more so at L5. After seeing the results of the MRI, Dr. Nixon ordered claimant off work. He prescribed epidural steroid injections, which claimant received on August 30, September 11, and September 20, 2001.

At employer's request, claimant saw Dr. Jay Levin on September 26, 2001. Dr. Levin told claimant that he suffered from a degenerative condition that was not related to his work injury, had reached maximum medical improvement (MMI), and could return to work without restrictions.

On October 18, 2001, claimant attempted to return to light-duty work at the Lincolnshire site. He punched in at 6:30 a.m. At that time, he had not taken any medication. Claimant waited some time for instructions. He began experiencing pain and took some medication at 8:40 a.m. Shortly thereafter, two employees from employer's main office in Park Ridge arrived and told claimant that his position had been filled. Claimant told the individuals that the medication he took left him unable to drive, and employer called a limousine to take him home.

On November 1, 2001, claimant began receiving a retirement pen-

sion through his union. Employer contributed to the union pension fund. The retirement benefit was $1,107 per month. On January 27, 2002, claimant began receiving Social Security retirement benefits of $1,026 per month.

Dr. Nixon advised claimant to see a neurosurgeon. Claimant chose to see Dr. Marshall Pedersen, whom he visited on November 12, 2001. Claimant denied experiencing any back problems before the accident. He complained of lower-back pain primarily on the right side and numbness in both legs below the knee. He reported that the pain he experienced interrupted his sleep three to six times per night and that walking for more than 10 minutes, sitting for more than 20 minutes, or bending over to lift items increased his pain. Dr. Pedersen recommended a lumbar discogram and a postdiscogram CT scan.

On December 7, 2001, claimant underwent the discogram. Before undergoing the procedure, claimant described the severity of his pain as 10 on a scale of 1 to 10. When the disc at L1-L2 was injected with dye, claimant rated his pain at 10 and reported no worsening of his pain upon pressurization of the disc. At L2-L3, claimant reported pain across his back similar to pain he typically experienced after his injury. At L3-L4, claimant reported pain similar to that he normally experienced. At L4-L5, claimant reported no increase in pain and did not appear to react to the disc pressurization. At L5-S1, claimant denied any worsening of his pain.

The postprocedure diagnosis was an annular tear at L4-L5 with a collection of material centrally and toward the right and an annular tear at L5-S1 with leakage. After reviewing the discogram results, Dr. Pedersen prescribed a thoracic lumbrosacral orthosis (TLSO) brace, a one-piece molded plastic brace that fits around the patient's midsection to stabilize the area. Its purpose is to help relieve the patient's pain and to give the treating physician an indication of whether the patient will respond to surgery.

Claimant next saw Dr. Pedersen on May 20, 2002, and complained of lower-back pain and bilateral numbness from the knees down. Dr. Pedersen diagnosed painful degenerative disc disease at L2-L3 and L3-L4 and painful herniated discs at L4-L5 and L5-S1. There was no indication of stenosis or nerve root impingement. Dr. Pedersen believed that, because claimant had been enduring symptoms for some time, he should consider surgery. Dr. Pedersen recommended a discectomy and cage fusion initially at L2-L3 and L3-L4. If, after six to eight months, the pain persisted, a second procedure at L4-L5 and L5-S1 should be performed.

During his May 24, 2002, deposition, Dr. Pedersen explained that a discogram involves injecting the nucleus pulposus of a disc with

radiographic dye. A patient generally does not report pain when a normal disc is injected and typically reports pain or an increase in pain when a significantly abnormal disc is injected.

Dr. Pedersen opined that claimant had a preexisting degenerative condition that was asymptomatic. Claimant's work-related accident aggravated the condition and caused it to become symptomatic. Specifically, he testified:

> "I believe that the symptoms and findings *** were the result of the work injury which he suffered on June 7th, 2001. *** [Claimant] likely had the degeneration of the disk in his lumbar spine preexisting the accident *** but *** the injury that occurred was the *** tearing of the annular ligaments due to the forcing of degenerated disk material through them that caused his discomfort and his current situation of ill health.
>
> * * *
>
> The interval between the injury and the [MRI] was *** 13 days. *** [T]hat is probably not a long enough [time] *** to allow these disks to completely leach out all their water and have all the changes that occur in them. So that's why it was my opinion that the degenerated disk disease that was present there likely predated the accident.
>
> *** I don't think any injury would have likely caused this problem. I think he had to have a significant injury where full force weight of fall, that kind of thing you would have that would do that."

Dr. Pedersen testified further that, because of the level of discomfort that claimant was experiencing, there were very few employment situations that claimant could tolerate. When asked if the fact that the TLSO brace did not alleviate claimant's symptoms indicated that claimant was not a surgical candidate, Dr. Pedersen replied that "[i]t's one of those things that *** if it works, fine, if it doesn't work, it doesn't add to the equation. *** You feel better about doing the surgery if he has a positive response to wearing the TLSO, but he did not. *** [W]e don't have any further information now than we did previously."

When asked about the reasonableness of claimant's epidural injections, Dr. Pedersen replied that they are "used for a variety of conditions in a person's back and some of it is irritation of nerve roots and some of it is for back pain. *** I don't have any problem with the fact that the patient had that particular procedure and I think it was quite indicated."

Claimant saw Dr. Levin a second time on August 28, 2002. Dr. Levin reviewed the results of the postdiscogram CT scan and opined that the annular tears at L4-L5 and L5-S1 were incidental to

claimant's complaints. He believed this because, during the discogram procedure, claimant reported pain while being injected at levels where there was no evidence of an annular tear. Dr. Levin's diagnosis was a lumbar contusion with degenerative changes at L3-L4, L4-L5, and L5-S1. He felt that surgery was not appropriate and reaffirmed his earlier opinion that claimant had reached MMI.

During his April 26, 2002, deposition, Dr. Levin testified that he believed that claimant did sustain an injury as a result of the work accident. He opined, however, that the right-sided L4-L5 disc herniation was not causally related to the work accident and was not causing claimant's symptoms. He explained that his examination revealed only a left-sided weakness of the left extensor hallus longus musculotendinous, which is an L5 innervated muscle. This left-sided finding was not related to the right-sided L4-L5 herniation. Dr. Levin believed that claimant could benefit from home exercises but did not require any formal medical treatment or therapy and could work without restrictions.

Also, Dr. Levin testified that he would not have prescribed the epidural injections. He explained that such injections are best suited to relieve radicular pain, i.e., "a mass occupying lesion pressing on a nerve with associated radicular complaints," but are very unlikely to alleviate back pain.

Claimant testified that, at the time of the hearing, he was still under Dr. Pedersen's restrictions of light-duty work only and no driving or operating heavy machinery. Claimant continued to experience pain, difficulty walking, and numbness in his arms and legs and was taking Darvocet. He planned to see Dr. Pedersen in October 2002.

Claimant never returned to work for employer after October 18, 2001, and has not sought out other employment. At the time of the hearing, claimant was still drawing a pension and collecting Social Security benefits. He explained that he sought these benefits because he needed money to meet his living expenses.

During claimant's direct examination, claimant was presented with each bill for which he sought recovery. For most bills, claimant identified the service he received and testified that, to the best of his knowledge, a balance remained unpaid. For some of the bills, claimant testified that he paid them himself and had not yet been reimbursed. During cross-examination, claimant acknowledged that he never contacted the providers to verify the balances and that he had no personal knowledge of the unpaid balances. During redirect examination, claimant explained that a collection agency had contacted him several times about the $8,522 bill for his discogram. When claimant later sought to introduce the bills into evidence, employer objected on

the ground that claimant failed to lay a proper foundation. The arbitrator overruled the objection.

Relying on the opinions of Drs. Nixon and Pedersen, the arbitrator found that claimant's current condition of ill-being was causally related to his work injury. Accordingly, he awarded TTD benefits from June 7, 2001, through September 20, 2002, or $67^{1}/_{7}$ weeks, and $17,676 in medical expenses. The arbitrator also found that the surgical procedures that Dr. Pedersen recommended were reasonable and necessary to relieve claimant's symptoms.

The Commission adopted the arbitrator's decision. Addressing employer's objection to the medical bills, the Commission found that "a proper foundation was laid when [claimant] testified that the bills had been sent to him at his home and to his knowledge remained unpaid. [Claimant] could not be expected to have personal knowledge as to whether his employer had paid the bills." The trial court confirmed the Commission's decision. Employer timely appealed.

## III. DISCUSSION

### A. Admissibility of Medical Bills

Employer argues that the arbitrator and the Commission erred in allowing claimant to introduce his medical bills over employer's objections that no proper foundation had been laid for them. Except when the Act provides otherwise, the Illinois rules of evidence govern proceedings before an arbitrator or the Commission. 50 Ill. Adm. Code § 7030.70(a) (2002); *Paganelis v. Industrial Comm'n*, 132 Ill. 2d 468, 479 (1989). Evidentiary rulings made during a workers' compensation proceeding will not be disturbed on review absent an abuse of discretion. *Mobil Oil Corp. v. Industrial Comm'n*, 327 Ill. App. 3d 778, 788 (2002).

Employer argues that the foundational requirements for admitting business records in general and for admitting medical bills in particular were not satisfied. Supreme Court Rule 236(a) (145 Ill. 2d R. 236(a)) sets forth the foundational requirements for documents admissible pursuant to the business records exception to the hearsay rule. The party offering the evidence must demonstrate that the record was made in the regular course of business and at or near the time of the transaction. 145 Ill. 2d R. 236(a). A proponent may lay an adequate foundation through the testimony of the custodian of the records or another person familiar with the business and its mode of operation. *National Wrecking Co. v. Industrial Comm'n*, 352 Ill. App. 3d 561, 567 (2004).

When evidence is admitted, through testimony or otherwise, that a medical bill was for treatment rendered and that the bill has

been paid, the bill is *prima facie* reasonable. *Baker v. Hutson*, 333 Ill. App. 3d 486, 493 (2002). A party seeking the admission into evidence of a bill that has not been paid can establish reasonableness by introducing the testimony of a person having knowledge of the services rendered and the usual and customary charges for such services. Once the witness is shown to possess the requisite knowledge, the reasonableness requirement necessary for admission is satisfied if the witness testifies that the bill is fair and reasonable. *Baker*, 333 Ill. App. 3d at 493.

■ Here, the only foundational testimony came from claimant, who testified that he received the bills and that, to the best of his knowledge, most of the balances remained unpaid. This testimony clearly did not meet the foundational requirements for admitting the bills. Claimant was not someone who was familiar with the medical providers' business practices or who could testify about the reasonableness of the charges. In *National Wrecking*, this court observed that, when a proper objection is raised, the proponent must lay an adequate foundation for the admission of documentary evidence. *National Wrecking*, 352 Ill. App. 3d at 567-68. The foundation for admitting medical bills could, for example, be established through the deposition testimony of the treating physicians or through the testimony of an employee of the medical practice who is familiar with the practice's billing methods and the reasonableness of the charges.

Because the bills were the sole basis for establishing the amount of the medical expenses award, the error in admitting the bills over employer's objection was not harmless. Therefore, the appropriate remedy is to reverse the medical expenses award and remand the cause for another hearing on the reasonableness of medical expenses only. See *Gaunt & Haynes, Inc. v. Moritz Corp.*, 138 Ill. App. 3d 356, 366-67 (1985). During this hearing, claimant will have the opportunity to establish a foundation for the admissibility of his medical bills. Our decision on this issue makes it unnecessary to address employer's argument that the medical expenses award is against the manifest weight of the evidence.

## B. Causation

Employer argues second that the Commission's decision on causation is against the manifest weight of the evidence. According to employer, Dr. Pedersen's causation opinion is speculative while Dr. Levin's opinion establishes that claimant's symptoms cannot be related to the conditions revealed by the imaging studies.

■ To obtain compensation under the Act, a claimant must show by a preponderance of the evidence that he or she has suffered a

disabling injury arising out of and in the course of his or her employ-ment. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). The "arising out of" component addresses the causal connection between a work-related injury and the claimant's condition of ill-being. *Sisbro*, 207 Ill. 2d at 203. A claimant need prove only that some act or phase of his or her employment was a causative factor in his or her ensuing injury. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005). An accidental injury need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro*, 207 Ill. 2d at 205.

■ Whether a causal connection exists is a question of fact for the Commission, and a reviewing court will overturn the Commission's decision only if it is against the manifest weight of the evidence. *Vogel*, 354 Ill. App. 3d at 786. It is the Commission's duty to resolve conflicts in the evidence, particularly medical opinion evidence. *Navistar International Transportation Corp. v. Industrial Comm'n*, 331 Ill. App. 3d 405, 415 (2002). The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002). For the Commission's deci-sion to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result. *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 729-30 (2000).

■ Dr. Pedersen testified that, before the accident, claimant likely suffered from degenerative disc disease. He opined, however, that the fall caused tearing of the annular ligaments. He opined further that it was unlikely that any injury would have caused his symptoms. Instead, a "full force" type of fall like the one claimant experienced was neces-sary to trigger the symptoms. There appears to be nothing inherently unreasonable about Dr. Pedersen's causation opinion. It is axiomatic that employers take their employees as they find them. *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 199 (2002). Thus, even though an employee has a preexisting condition that may make him or her more vulnerable to injury, recovery will not be denied where the employee can show that a work-related injury aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to be causally related to the work injury and not merely the result of a normal degenerative process of the preexisting condition. *Sisbro*, 207 Ill. 2d at 204-05.

Dr. Levin opined that the annular tears at L4-L5 and L5-S1 were not related to claimant's complaints. He believed this because, during the discogram procedure, claimant reported pain while being injected at levels where there was no evidence of an annular tear. He explained

further that his examination revealed only a left-sided weakness of the left extensor hallus longus musculotendinous and that this left-sided finding was not related to the right-sided L4-L5 herniation.

There is nothing in the record to indicate that the Commission was required to accept Dr. Levin's opinion as indisputable fact. The Commission reasonably could have found that claimant's reports of no changes in pain during the discogram procedure were not significant in light of the fact claimant already was experiencing a great deal of pain when the procedure commenced. Also, the left-sided finding that Dr. Levin diagnosed does not appear in the reports of any other physicians.

Although the medical opinion evidence here conflicted, it was not unreasonable for the Commission to find that the balance of evidence tipped in favor of claimant. Proof of prior good health and change immediately following and continuing after an injury may establish that an impaired condition was due to the injury. *Navistar International Transportation Corp. v. Industrial Comm'n*, 315 Ill. App. 3d 1197, 1205 (2000). Here, there was no record of back or leg complaints before the work accident. The accident caused symptoms that persisted through the time of the arbitration hearing. There was no dispute that claimant suffered from an annular tear, and Dr. Pedersen opined that the condition was causally related to the work accident. Under these circumstances, we cannot say that the Commission's decision on causation was against the manifest weight of the evidence.

## C. Surgery

■ Next, employer argues that the Commission's finding that employer should pay for surgery that Dr. Pedersen prescribed is against the manifest weight of the evidence. Section 8(a) of the Act entitles a claimant to compensation for all necessary medical, surgical, and hospital services "thereafter incurred" that are reasonably required to cure or relieve the effects of the injury. 820 ILCS 305/8(a) (West 2002). Specific procedures or treatments that have been prescribed by a medical service provider are "incurred" within the meaning of the statute, even if they have not yet been paid for. *Homebrite Ace Hardware v. Industrial Comm'n*, 351 Ill. App. 3d 333, 341 (2004).

Employer takes issue first with Dr. Pedersen's recommendation to operate initially at L2-L3 and L3-L4. According to employer, Dr. Pedersen failed to explain how operating at these levels, where the discs are not herniated, will relieve claimant's symptoms. Dr. Pedersen testified, however, that claimant suffered from *painful* degenerative disc disease at L2-L3 and L3-L4. Dr. Pedersen's general opinion was

that claimant suffered from asymptomatic degenerative disc disease that became symptomatic after the work accident. Thus, there was a sufficient medical basis for Dr. Pedersen's recommendation.

Employer argues second that Dr. Pedersen's recommendation is suspect in light of the TLSO brace's failure to alleviate claimant's symptoms. The Commission reasonably could have found, however, that the TLSO brace results did not negate the need for surgery. When confronted with claimant's lack of response to the brace, Dr. Pedersen persisted in his opinion that surgery could help claimant. Claimant suffered from disc problems at multiple levels, and conservative treatment failed to alleviate his symptoms. It is difficult to say that Dr. Pedersen's recommendation is inherently unreasonable or that the Commission's decision to authorize the surgery is against the manifest weight of the evidence.

## D. TTD

Finally, employer claims that the TTD award is against the manifest weight of the evidence. The time during which a claimant is temporarily totally disabled is a question of fact for the Commission, and a reviewing court will disturb the Commission's findings on this issue only if they are against the manifest weight of the evidence. *Anders v. Industrial Comm'n*, 332 Ill. App. 3d 501, 507 (2002).

■ Temporary total disability benefits are awarded for the period from when an employee is injured until he or she has recovered as much as the character of the injury will permit. *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 760 (2003). A person is totally disabled when he or she cannot perform any services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them. *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 122 (1996). A claimant seeking TTD benefits must prove not only that he or she did not work, but also that he or she was unable to work. *Anders*, 332 Ill. App. 3d at 507. The dispositive test is whether the claimant's condition has stabilized, *i.e.*, reached MMI. *Mechanical Devices*, 344 Ill. App. 3d at 759. The factors to consider in deciding whether a claimant's condition has stabilized include (1) a release to return to work; (2) the medical testimony about the claimant's injury; and (3) the extent of the injury. *Beuse v. Industrial Comm'n*, 299 Ill. App. 3d 180, 183 (1998).

■ Employer raises two contentions challenging the amount of the TTD award. First, employer relies generally on the findings of Dr. Levin, who on September 26, 2001, opined that claimant had reached MMI and could return to work without restrictions. Employer stresses that claimant made only one "feeble" attempt to return to work and thereafter removed himself from the labor market.

The evidence on this issue conflicted, and the evidence of claimant's condition supports the Commission's award. After reviewing the results of the June 25, 2001, MRI, Dr. Nixon ordered claimant off of work. The MRI and the discogram revealed a significant lumbar condition, and conservative treatment failed to alleviate claimant's symptoms. In May 2002, Dr. Pedersen testified that, because of the level of discomfort that claimant was experiencing, there were very few employment situations that claimant could tolerate. At the time of the arbitration hearing, claimant was still experiencing pain, taking medication, and treating with Dr. Pedersen. The Commission reasonably could have found that, because conservative treatment was unsuccessful and claimant had not yet undergone surgery, claimant had not reached MMI.

Alternatively, employer claims that claimant is not entitled to TTD benefits beyond November 1, 2001, the date he voluntarily retired. This court has upheld Commission decisions to deny TTD benefits after finding that the claimant voluntarily ceased working. See *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087, 1090-91 (1996) (upholding decision to deny TTD benefits beyond date claimant took a disability retirement where there was no evidence that claimant could not return to light-duty work); *Gallentine v. Industrial Comm'n*, 201 Ill. App. 3d 880, 887 (1990) (three physicians released claimant to light-duty work, and no medical evidence corroborated claimant's testimony that she could not work at the light-duty job employer offered). The facts here, however, did not require the Commission to find that claimant voluntarily left his employment and therefore is not entitled to TTD benefits beyond his retirement date. In the cases just cited, the Commission chose to rely on evidence that the claimant could have worked but instead chose not to work. Here, there was competent evidence that claimant was unable to work and that he retired not by choice but because he needed income. We note that, although employer argued before the arbitrator and the Commission that it was entitled to a credit under section 8(j)(2) of the Act (820 ILCS 305/8(j)(2) (West 2000)) for the pension and Social Security benefits that claimant received, it does not advance that argument on appeal.

## IV. CONCLUSION

The arbitrator and the Commission erred in allowing claimant's medical bills to be admitted over employer's foundational objections. Therefore, we reverse the medical expenses award and remand the cause for another hearing on the reasonableness of the medical expenses. All other aspects of the Commission's ruling are not against

the manifest weight of the evidence. Accordingly, that part of the judgment of the circuit court of Lake County confirming all aspects of the Commission's decision other than the medical expenses award is affirmed.

Affirmed in part and reversed in part; cause remanded to Workers' Compensation Commission with instructions.

McCULLOUGH, P.J., and HOFFMAN and HOLDRIDGE, JJ., concur.

JUSTICE DONOVAN, specially concurring:

While I join with the majority's opinion, I write separately to emphasize the risks of making a boilerplate objection, as was done here.

On appeal, employer argues that it was error to admit the billing statements into evidence, because claimant failed to lay a proper foundation to show that the charges for the medical services were usual and customary. However, this specific ground was not advanced at the time of the arbitration. According to the briefs, employer objected when claimant moved to admit his medical bills. Employer objected that "a proper foundation wasn't laid" where claimant testified that "he had no personal knowledge as to the amount of the bill owed or, in fact, if anything at all was owed."

A party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in a waiver of objections as to all other grounds not specified or relied on. See *Barreto v. City of Waukegan*, 133 Ill. App. 3d 119, 130 (1985). Where the ground for objection is of a character that may be remedied or avoided, such as lack of foundation, the party objecting must point out the objection specifically, so that his opponent has the opportunity to correct it. See *Central Steel & Wire Co. v. Coating Research Corp.*, 53 Ill. App. 3d 943, 945-46 (1977). Here the lack of a specific objection deprived claimant of the opportunity to correct or clarify his record. It also deprived the arbitrator of an opportunity to fully consider the issue at the time the evidence was presented. Under the present circumstances, I concur with the majority's conclusion that the award of medical expenses should be set aside and the cause remanded to the Industrial Commission for the submission of additional evidence regarding the reasonableness of the medical expenses.