2016 IL App (1st) 152116WC

FILED: November 10, 2016

NO. 1-15-2116WC

IN THE APPELLATE COURT

OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| MARK MYTNIK, | ) | Appeal from |
|     Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | No. 14L50836 |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.* (Ford Motor Company, | ) | |
| Appellees). | ) | Honorable |
| | ) | Carl Anthony Walker, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Stewart
concurred in the judgment and opinion.

**OPINION**

¶ 1        On June 23, 2009, claimant, Mark Mytnik, filed an application for adjustment of

claim pursuant to the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West

2008)), seeking benefits from the employer, Ford Motor Company, for injury to his back caused

by "[e]xcessive twisting and bending on job."  Following a hearing, the arbitrator found claimant

sustained a compensable injury and awarded him benefits under the Act.  On review, the Illinois

Workers' Compensation Commission (Commission) reversed the decision of the arbitrator,

finding that claimant failed to establish his injury arose out of and in the course of his

employment.  On judicial review, the circuit court confirmed the Commission's decision.  This

appeal followed.

¶ 2        On appeal, claimant challenges the Commission's finding that he failed to prove an accident arising out of and in the course of his employment. We reverse the circuit court's judgment confirming the Commission's decision, reverse the Commission's decision, and reinstate the decision of the arbitrator.

¶ 3                               I. BACKGROUND

¶ 4        The following evidence was elicited at the February 25, 2013, arbitration hearing.

¶ 5        Claimant testified that he had worked for the employer on the assembly line since October 1994. On May 21, 2009, he was working the "moon buggy" job which involved installing rear suspensions on vehicles as they moved along the assembly line. The moon buggy job required the employee to stand on a platform which moved in a circular fashion, step on a foot pedal to raise the rear suspension up to the vehicle, reach back and grab an articulating arm, load the articulating arm with two bolts, and then raise the articulating arm up to the vehicle and press a button on the arm which secured the rear suspension with bolts. According to claimant, the moon buggy job required him to twist and turn to grab equipment like bolts and brackets, and to reach behind him to grab the articulating arm. Claimant stated that sometimes the bolts would fall out of the articulating arm and had to be retrieved quickly to avoid the rotating platform from running over the bolts and jamming, which would result in the assembly line shutting down. When a bolt fell, claimant would have to "run down there, bend over, reach and *** pick it up before the [rotating platform] runs it over." According to claimant, if the assembly line stopped, "you would usually get reamed out by the supervisor."

¶ 6        Claimant testified the moon buggy job allowed approximately 48 to 52 seconds to install the rear suspension on one vehicle before the assembly line moved. He estimated that he

installed rear suspensions on approximately 62 vehicles per hour. In addition, he had to lift approximately 20 to 25 boxes of parts per day that weighed "anywhere from 30lbs, a lot heavier if you're doubling them up, 70 pounds per box." Claimant worked on the assembly line five days per week, approximately 10 hours per day with two breaks.

¶ 7     Claimant further testified that he started his workday at 6 a.m. on May 21, 2009. At approximately 10 a.m., he "noticed [his] back was starting to bother [him]." Claimant explained that he had sustained a prior back injury at the employer's plant in 2002 or 2003. He continued to do his job that morning, but later, as he was reaching down to grab a bolt that had fallen on the assembly line, he felt "a real sharp, almost like needle pains down [his] right side, [he] knew something *** was just out of the ordinary." Within 10 to 15 minutes of this, claimant flagged down his supervisor, Zack Bozanic, and informed him that his back was hurting. After Bozanic found someone to take over claimant's job, he sent claimant to the employer's medical department. Claimant testified that once at the medical department, he reported sharp pains down the right side of his leg and that his back was bothering him. As he was sitting on a table, he noticed his leg started getting "a little numb." The report from the medical department indicated claimant was seen at 12:17 p.m. and lists the time of onset of pain as 8:30 a.m. The report noted that claimant was "working on the moon buggy and [his right] leg stays on the foot paddle and as the moon buggy moves it twists [his] body and now [he] has [pain] in [his right] hip." In addition, claimant complained of "low back [pain] radiating down the right hip and back of upper leg." Claimant was diagnosed with a sprain and strain of his lumbar spine and pelvis. He was given ibuprofen and returned to work. Later that day, claimant filled out an accident report in which he stated: "moonbuggy move[s] and you have your [right] leg on foot [pedal,] your [left] leg does not move so your body [turns.] I [felt] it when I was

picking up bolts off the floor. Twisting of body felt pain in [right] hip and leg."

¶ 8        Claimant testified that he finished his shift, but when he woke up the next day, he was "in excruciating pain." He returned to work on May 26, 2009, and reported he was unable to bend, twist, or stand. Claimant was sent back to the employer's medical department and from there, he was sent to Ingalls Urgent Care (Urgent Care). Medical reports from Urgent Care indicated that claimant noted "NO SPECIFIC TRAUMA," but reported "that he was using a foot pedal repetitively with his right foot and twisting and turning when he began with right lower back pain that radiated down the posterior lateral aspect of his right thigh to his right foot." A magnetic resonance imaging (MRI) scan of claimant's lumbar spine was performed that day and compared with a previous MRI dated December 3, 2003. The new MRI revealed a broad posterocentral and right paracentral disc herniation at L4-L5 that was not present on the 2003 MRI, and a preexisting broad posterocentral disc herniation at L5-S1.

¶ 9        Claimant testified that he returned to work the following day and reported directly to the medical department. According to claimant, he stayed in the medical department for approximately six hours. At one point, Michelle Gregory, the employer's workers' compensation administrator spoke with him. Claimant stated that he told her his back "was bothering [him]," that "there [was] twisting involved, picking up of stock" and when he "pick[ed] up that bolt[, he] felt that sharp pain." Claimant testified that Gregory returned a few hours later and told him "there [was] no way [he] could have got hurt on this job," and that he needed to find his own physician. The report from the medical department stated that upon observation of the moon buggy job, "[t]here [was] no bending, twisting or heavy lifting involved" and "[t]he case is denied as occupational after the above observation."

¶ 10        On May 27, 2009, claimant saw his primary care physician, Dr. William Luebbe,

for his back pain.  Dr. Luebbe referred him to Dr. Mark Chang for a surgical consultation.

¶ 11        Claimant first saw Dr. Mark Chang at Midwest SpineCare on June 4, 2009.  In a letter addressed to Dr. Leubbe of the same date, Dr. Chang indicated claimant had reported pain in his low back radiating down his right leg which began two weeks prior after a work-related accident "when he was picking up some bolts while working on an assembly line."  Dr. Chang also noted claimant had a history of low back pain in 2003, but had completed physical therapy and had experienced no further back problems prior to the recent injury.  Dr. Chang diagnosed claimant with an "[a]cute right L5 radiculopathy secondary to a new L4-5 disc herniation causing significant nerve impingement, [and an] old L5-S1 disc herniation not causing radiculopathy." He recommended physical therapy and epidural injections for pain.

¶ 12        On June 8, 2009, claimant first saw Dr. Rajive Adlaka for management of his pain.  At that time, Dr. Adlaka noted claimant presented with complaints of low back pain with right side-dominant radiculopathy which began after he "ben[t] down to pick something up."  On June 9 and June 30, 2009, Dr. Adlaka administered epidural steroid injections.

¶ 13        On June 16, 2009, claimant presented for an initial physical therapy evaluation at Accelerated Rehabilitation Centers.  The office report from that date indicated claimant reported, "he was lifting and pulling equipment at work  [on May 21, 2009, when] he started feeling a sharp pain in his [right] hip and [right] leg.  *** [T]he following weekend, [he] started experiencing more pain on the quadrates lumborum and his [right] buttock."

¶ 14        On July 20, 2009, claimant saw Dr. Edward Goldberg for a second opinion.  On that date, Dr. Goldberg indicated claimant reported developing right leg radicular pain on May 21, 2009.  Dr. Goldberg's records note, "[claimant] was working on the line at Ford Motor Company.  He twisted an arm of a machine and developed acute low back and right leg radicular

pain. *** [I]t became progressively severe over the weekend. He could not move." Dr. Goldberg's records were later corrected to state claimant "twisted his waist to reach back for the arm of a machine he uses to complete his job; then he developed acute low back right leg radicular pain." Dr. Goldberg reviewed an MRI of claimant's spine and diagnosed a disc herniation at L4-5 and a small herniation or annular bulging at L5-S1. Dr. Goldberg felt that claimant's pain was caused by the herniated disc at L4-5 and he recommended a microdiskectomy at L4-5. He also noted it would be reasonable to perform a hemilaminotomy at L5-S1. Dr. Goldberg performed these procedures on August 4, 2009. Claimant continued to treat with Dr. Goldberg postoperatively. On February 1, 2010, Dr. Goldberg found claimant had reached maximum medical improvement (MMI) and released him to return on March 1, 2010, with a permanent restriction of lifting no more than 25 pounds.

¶ 15  Claimant returned to work on March 1, 2010. However, by March 2, 2010, claimant testified he "ended up hurting [him]self again" and, thereafter, he was unable to work due to pain and an inability to stand, twist, or bend for very long.

¶ 16  On March 8, 2010, claimant saw Dr. Martin Luken, a board-certified neurologist. At his deposition, Dr. Luken testified that claimant reported having developed right-sided low back pain and sciatica while at work in May 2009 "as he engaged in his usual routine involving repetitive bending and light lifting while attending to automobiles passing him on the assembly line." Dr. Luken testified that claimant continued to have pain in his right buttock and leg which persisted in spite of postoperative physical therapy. He further noted that claimant had suffered a work-related low back injury "a decade or more earlier," but that it had responded well to conservative treatment. Following a physical examination and a review of prior medical records, Dr. Luken diagnosed claimant with "persisting mechanical back pain and right lumbar

radiculopathy status post lumbar discectomy and foraminotomy for a work-related disc herniation." Dr. Luken prescribed pain medication and physical therapy, and suggested a functional capacity evaluation. Dr. Luken felt claimant could return to work at that time in a sedentary capacity involving no bending, stooping, twisting, or lifting more than 10 pounds.

¶ 17 Dr. Luken reviewed a video of claimant's job, but based on information provided by claimant, he did not feel the video accurately portrayed claimant's job duties. For example, Dr. Luken testified that based on information provided to him by claimant, he understood claimant's "usual work routine involved a repetitive bending and light lifting [as well as] holding a pedal down with one foot while reaching behind him to grasp and deal with a power tool of some sort." Dr. Luken continued, "[claimant] had to keep one foot planted on a pedal while twisting to retrieve this instrument that deal[s] with each passing car." According to Dr. Luken, the activities described by claimant were not portrayed in the video. Based on the history provided by claimant, Dr. Luken opined, "the repetitive mechanical stresses which [claimant's] work likely brought to bear to his lower back, in my opinion, very plausibly accounted for lower lumbar injury and either precipitation or exacerbation of the demonstrated disc herniation which we believe was responsible for [the] symptoms [claimant] reported as having developed in the course of his work" in May 2009. Dr. Luken last saw claimant on May 17, 2010, at which time he continued to be of the opinion that claimant could return to light-duty work while waiting for a functional capacity evaluation.

¶ 18 On June 2, 2010, claimant saw Dr. Jesse Butler, a board-certified orthopedic surgeon, at the request of the employer. At his deposition, Dr. Butler testified that claimant provided a history of being an assembly line worker who, "during the course of his occupation, *** has to pick up stock for assembly and place bolts on an articulating computer arm." In

addition, "he's required to push a foot pedal during the course of this assembly operation, and that there's a twisting motion involved in completing this job assignment. He states he injured his back." Dr. Butler acknowledged that claimant underwent a microdiscetomy surgery in August 2009 which improved his overall pain. However, Dr. Butler testified that as of June 2, 2010, defendant continued to complain of having low back pain "between a 5 and 6 out of 10" with minimal activity, as well has numbness in his right calf into the foot, with occasional buckling of the right leg.

¶ 19        In addition to conducting a physical examination, Dr. Butler also reviewed claimant's medical records and a video of the moon buggy job. At the time of Dr. Butler's examination of claimant, claimant had already undergone a microdiscectomy and completed several months of postoperative physical therapy. Dr. Butler reviewed claimant's May 2009 and December 2003 MRIs. He noted that the May 2009 MRI revealed a disk herniation at L4-5 which was not present on the December 2003 MRI, as well as a disk herniation at L5-S1 which was present in the December 2003 MRI. Dr. Butler opined that claimant had reached MMI as he had undergone surgery, completed "an appropriate amount of therapy," and was able to work based on "the physical therapist's determination of his functional capacities." According to Dr. Butler, the degenerative changes noticeable on the MRI "most likely, preceded the accident," but "it's difficult to know when [the disk herniation] may have occurred." Further, Dr. Butler testified that people with degenerative changes in the spine may become symptomatic by merely bending over or lifting something.

¶ 20        Regarding the video, Dr. Butler testified the moon buggy job did not appear to involve "any twisting movement during this assembly operation, and the pace with which the bolts were drilled seemed to be at a very comfortable pace for someone doing this job." Dr.

Butler testified the activities depicted in the video were not sufficient to cause claimant's injury because "[t]here's really no loading of the spine, *** no occupational exposure, if you will, when you look at that job video." In his opinion, claimant had reached MMI and could perform the activities he had viewed in the video.

¶ 21    On cross-examination, Dr. Butler testified it was a possible that a herniated disc could result from bending over to pick up a bolt by someone with degenerative changes to their spine.

¶ 22    On June 1, 2011, claimant saw Dr. Andrew Zelby, a board-certified neurosurgeon, at the request of the employer. In addition to conducting a physical examination of claimant, Dr. Zelby also reviewed claimant's medical records. Dr. Zelby testified that claimant told him he was performing his regular job duties on May 21, 2009, and "did not have any specific event or injury but felt pain in the low back radiating into the right buttock and down the right leg." Claimant "notice[d] that when he bent to pick up a bolt the pain seemed sharper for a couple of seconds." Following his examination of claimant, Dr. Zelby was of the opinion that, other than self-directed stretching and core-strengthening exercise, claimant needed no further treatment and could return to work in the medium-physical-demand level without any increased risk for injury.

¶ 23    On June 26, 2011, claimant saw Dr. Michael Treister, an orthopedic surgeon, on his own accord. At his deposition, Dr. Treister testified that in addition to performing a physical examination of claimant and obtaining x-rays of his lumbar spine, he also reviewed claimant's medical records, including those from Dr. Luken, Dr. Chang, Dr. Adlaka, Dr. Luebbe, Dr. Butler, and Dr. Goldberg, the depositions of Dr. Butler and Dr. Luken, and a report issued by Dr. Zelby. Dr. Treister stated that at the time of the examination, claimant reported he was injured

while working on an assembly line. According to Dr. Treister, claimant explained that his job required him to step on a pedal with one foot while simultaneously reaching back to pull the articulating arm forward to secure the suspension with two bolts. Claimant told him that sometimes a bolt would fall and he would have to retrieve it quickly. He also had to pick up boxes of bolts, sometimes two at a time, weighing 20 to 30 pounds, so that he was frequently lifting and twisting with 40 to 60 pounds. Dr. Treister continued, claimant told him, "on the day that he was injured, he began to have sharp low back pains, not while he was standing on the job, but while he was eating lunch. Pain began in the center of his *** right lower back and radiated down into his right buttock and then into the right posterior leg." After he reported to the employer's medical clinic, he returned to his job and his pain increased throughout the day as he worked, and throughout the following days. Following his examination of claimant, Dr. Treister diagnosed failed back syndrome and opined that claimant's condition was causally related to a May 21, 2009, work accident. Dr. Treister based his causation opinion on the fact that claimant had preexisting degenerative disc disease which put him at risk of herniation, and that he then had a sudden onset of pain while working. In Dr. Treister's opinion, it did not matter how the injury came to be, whether from twisting, lifting, or bending, because in any case, the injury was related to one of his job activities.

¶ 24       Terrance Purdy testified that he had worked for the employer for 19 1/2 years and, most recently, had been working "general utility" which required him to be able to perform all of the jobs in the area. Purdy stated that he had worked the moon buggy job on and off for three or four years, but he had been consistently working the moon buggy job since claimant was injured. According to Purdy, the job requires twisting, bending, reaching, and lifting between 20 to 30 boxes of bolts per day. He further testified that sometimes a bolt will fall and when it does, it

must be retrieved before the moving platform runs over it in order to prevent the assembly line from shutting down. In Purdy's experience, a bolt would fall twice per hour.

¶ 25      Hugh Ferguson III, testified on behalf of the employer. He had worked for the employer for 44 years, most recently as the government regulation coordinator. Furguson stated he also takes videos of certain jobs within the assembly plant when requested by the employer. While he never knows the purpose of the videos, the workers' compensation department shows him exactly what to record. According to him, the employer asked him to take a video of the moon buggy job in this case, which he did during normal business hours. Prior to taking the video, he was not provided with a description of the job, any information pertaining to the employee depicted on the video, or told how long to record for.

¶ 26      Claimant testified that the video did not accurately depict the moon buggy job. According to claimant, the line was not going nearly as fast as it should have been and the video showed the line actually stopping. Further, he stated the person depicted in the video was not putting nearly the number of parts on the vehicle as claimant did when he performed the job. (We note that the video was not included in the record.)

¶ 27      Zachary Bozanic, testified last on behalf of the employer. He had worked for the employer for 19 years, most recently as a senior process coach. In May of 2009, he was a production supervisor who supervised the moon buggy job. Bozanic described the moon buggy job as a preferred job because it is less complex and physically demanding than other jobs. He agreed that if a bolt dropped in the middle of the track, it would stop the moon buggy and stall the line.

¶ 28      Claimant testified at arbitration that he continued to have pain in his lower back area, down the hip area, and into the leg. In addition, his right knee sometimes buckled.

Claimant stated that Dr. Luken had recommended a fusion surgery, but claimant testified he did not want to undergo another surgery at that time.

¶ 29        On June 13, 2013, the arbitrator issued his decision in the matter.  He found claimant sustained an accident that arose out of and in the course of his employment and that claimant's current condition of ill-being in his back was causally related to the work accident.  The arbitrator found the employer liable for claimant's medical expenses, and awarded him 79 1/7 weeks temporary total disability (TTD) benefits, and permanent partial disability (PPD) benefits to the extent of 25% of the person as a whole.

¶ 30        On October 7, 2014, the Commission unanimously reversed the decision of the arbitrator, finding that claimant failed to prove an injury arising out of and in the course of his employment.  Prior to stating it reasons, the Commission noted as follows:

"So that the record is clear, and there is no mistake as to the intentions or actions of this Commission, we have considered the record in its entirety.  We have reviewed the facts of the matter, both from a legal and a medical/legal perspective.  We have considered all of the testimony, exhibits, pleadings and arguments submitted by [claimant] and the [employer].  And after a complete review of the record, the Commission finds that [claimant's] varied and inconsistent histories of the May 21, 2009[,] incident undermine his claim that he suffered accidental injuries arising out of and in the course of his employment with [the employer] on May 21, 2009."

The Commission then recounted all of the histories claimant had provided to the various medical providers and noted,

> "despite all of the histories provided by [claimant] through this treatment, [he] testified at hearing that his low back pain with radiation down the right lower extremity started when he reached down to retrieve a bolt that had fallen to the floor. [Claimant] chose to proceed to trial with this history. Accepting [claimant's] chosen history of the accident, despite the multiple accounts he had provided, the Commission finds that [claimant] failed to prove that he suffered [a compensable injury]."

While the Commission acknowledged that claimant's May 2009 MRI revealed a herniation at L4-L5 that was not present on the December 2003 MRI, it found that claimant's "degenerative lumbar discs gave way with the simple act of bending forward," demonstrating that his "lumbar condition was so deteriorated that any activity of normal life was sufficient to cause [his] spine to break down further." The Commission also found that claimant's act of bending down to retrieve a bolt did not expose him to a greater risk of injury than the general public.

¶ 31        On June 24, 2014, the circuit court of Cook County confirmed the Commission's decision.

¶ 32        This appeal followed.

¶ 33                              II.  ANALYSIS

¶ 34        On appeal, claimant challenges the Commission's finding that he failed to prove an accident arising out of and in the course of his employment. In contrast, the employer maintains that the Commission properly denied compensation for three different reasons, each of

which it claims was sufficient on its own to support the decision.

¶ 35     Initially, the employer contends that the Commission found claimant failed to establish a work accident based on his inconsistent histories of the incident.  However, we must reject the employer's suggestion that the Commission rejected the claim on this basis.  Although the Commission stated, claimant's "varied and inconsistent histories of the May 21, 2009[,] incident *undermine* his claim that he suffered accidental injuries arising out of and in the course of his employment," it did not deny claimant compensation on that basis.  (Emphasis added.) Rather, the Commission continued its analysis and ultimately denied the claim after finding (1) claimant "was not engaged in an activity which presented a greater risk of injury to him than to the general public" and (2) had a preexisting lumbar condition that "was so deteriorated that any activity of normal life was sufficient to cause [his] spine to break down further."  Accordingly, we focus our analysis on the two bases determined by the Commission to be dispositive.

¶ 36     The purpose of the Act is to protect employees against risks and hazards which are peculiar to the nature of the work they are employed to do.  *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509 N.E.2d 1005, 1008 (1987).  "To obtain compensation under the Act, a claimant bears the burden of showing, by a preponderance of the evidence, that he has suffered a disabling injury which arose out of and in the course of his employment."  *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 671 (2003).  "Both elements must be present at the time of the claimant's injury in order to justify compensation."  *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 25, 990 N.E.2d 284.  An injury occurs "in the course of employment" when it "occur[s] within the time and space boundaries of the employment."  *Sisbro*, 207 Ill. 2d at 203, 797 N.E.2d at 671.  An injury "arises out of" employment when "the injury had its origin in some risk connected with, or

incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Id*.

¶ 37       Whether an injury arose out of and in the course of one's employment is generally a question of fact and the Commission's determination on this issue will not be disturbed unless it is against the manifest weight of the evidence. *Brais v. Illinois Workers' Compensation Comm'n*, 2014 IL App (3d) 120820WC, ¶ 19, 10 N.E.3d 403. "In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence." *Id*. "The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion." *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592, 834 N.E.2d 583, 592 (2005). "For the Commission's decision to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result." *Land & Lakes*, 359 Ill. App. 3d at 592, 834 N.E.2d at 592.

¶ 38       Because we reject the employer's contention that the Commission found claimant did not suffer a work accident, we turn our focus to whether claimant's injury "arose out of" his employment. To determine whether a claimant's injury arose out of his employment, we must first determine the type of risk to which he was exposed. *Baldwin v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 472, 478, 949 N.E.2d 1151, 1156 (2011). This court has recognized three categories of risk to which an employee may be exposed: (1) risks that are distinctly associated with one's employment; (2) neutral risks that have no particular employment or personal characteristics, such as those that the general public is commonly exposed; and (3)

risks that are personal to the employee. *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 27, 990 N.E.2d 284.

¶ 39    In analyzing risk, the first step is to determine whether a claimant's injuries arose out of an employment-related risk. A risk is distinctly associated with employment "if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties." *Caterpillar*, 129 Ill. 2d at 58, 541 N.E.2d at 667. "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Id.* If a claimant's injury is determined not to have resulted from an employment-related risk, we must then consider whether it was a result of a neutral risk or a personal risk. See *e.g.*, *Young v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC, ¶ 23, 13 N.E.3d 1252 ("When a claimant is injured due to an employment-related risk *** it is unnecessary to perform a neutral-risk analysis.").

¶ 40    Injuries arising out of neutral risks, which have no particular employment or personal characteristics, are generally not compensable. *Springfield*, 2013 IL App (4th) 120219WC, ¶ 27, 990 N.E.2d 284. Neutral risks include stray bullets, dog bites, lunatic attacks, lighting strikes, bombings, hurricanes, and falls while traversing stairs, public sidewalks and commercial driveways. *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 163, 731 N.E.2d 795, 807 (2000); *Village of Villa Park v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 130038WC, ¶ 20, 3 N.E.3d 885; *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014, 944 N.E.2d 800, 804 (2011). However, injuries arising out of neutral risks

may be compensable if the claimant can show he was exposed to a risk to a greater degree, either qualitatively or quantitatively, from that of the general public. *Metropolitan Water*, 407 Ill. App. 3d at 1014, 944 N.E.2d at 804.

¶ 41        Finally, injuries arising out of personal risks, which "include exposure to elements that cause nonoccupational diseases, personal defects or weakness, and confrontations with personal enemies" are generally not compensable. *Illinois Consolidated Telephone Co. v. Industrial Comm'n*, 314 Ill. App. 3d 347, 353, 732 N.E.2d 49, 54 (2000).  An exception to this general rule of noncompensability concerns injuries caused by idiopathic falls where "work place conditions significantly contribute[d] to the injury by increasing the risk of falling or the effects of a fall." *Id.*

¶ 42        In this case, the Commission found that claimant failed to prove a work accident because his act of bending down to pick up a bolt did not expose him to a greater risk of injury than the general public.  In other words, the Commission determined claimant's injury was the result of a noncompensable neutral risk.  Implicit in its decision is a determination that claimant's injury did not result from an employment-related risk.  On review, claimant contends that the Commission's decision on this issue was against the manifest weight of the evidence.  According to claimant, his injury arose out of a risk distinctly associated with his employment and, therefore, a neutral-risk analysis was unnecessary.

¶ 43        In support of his contention, claimant relies on *Young*, 2014 IL App (4th) 130392WC, 13 N.E.3d 1252.  In *Young*, the claimant was a parts inspector whose job, in relevant part, was to examine parts to ensure they were made according to specifications. *Id*. ¶ 4.  On the day of his work accident, the claimant was inspecting parts contained in a deep, narrow box. *Id*.  As he was reaching for the last item in the box, he felt a "snap or pop" in his shoulder. *Id*.  The

Commission denied benefits on the basis " 'that the mere act of reaching down for an item did not increase [the claimant's] risk of injury beyond what he would experience as a normal activity of daily living.' " *Id.* ¶ 14. On review, however, this court found, "[a]lthough the act of 'reaching' is one performed by the general public on a daily basis, the evidence in this case established the risk to which claimant was exposed was necessary to the performance of his job duties at the time of his injury." *Id.* ¶ 28.

¶ 44        Similar to the risk involved in *Young*, in this case we find that the risk associated with the act of bending down to pick up a fallen bolt was an employment-related risk. Specifically, the evidence showed that claimant's job required him to load bolts into an articulating arm, raise the arm up to the vehicle and press a button on the arm to secure the rear suspension with the bolts. Witness testimony established that during this process, it was not uncommon for bolts to fall out of the articulating arm and onto the floor. Claimant, along with Purdy and Bozanic, testified that if the bolts were not retrieved from the floor before the rotating platform ran them over, the rotating platform would jam which would then result in the entire assembly line shutting down. According to claimant, in the event that the assembly line stopped, he would be subject to discipline.

¶ 45        Here, we find the manifest weight of the evidence establishes claimant's injuries occurred as a result of a risk distinctly associated with his employment. While the act of "bending" may be an act performed by the general public on a daily basis, the evidence established that bolts would regularly fall out of the articulating arm during the assembly process. When a bolt would fall, claimant had to "run down there, bend over, reach and *** pick it up before the [rotating platform] r[an] it over." In other words, picking up fallen bolts was an integral part of claimant's job. Because the risk associated with claimant's act of bending to pick

up the bolt was a risk distinctly associated with his employment, he established that his injury "arose out of" his employment. The Commission's failure to find an employment-related risk is against the manifest weight of the evidence.

¶ 46        We also find that the record does not support the Commission's determination that claimant's injury was not compensable because his "preexisting back condition was so deteriorated that his back simply gave out during a basic daily activity." In reaching its decision, the Commission relied on *County of Cook v. Industrial Comm'n*, 69 Ill. 2d 10, 370 N.E.2d 520 (1977). The *Cook* court recognized a limitation to the general rule that "the employee need only prove that some act or phase of the employment was a causative factor of the resulting injury," to be compensable under the Act *Id*. at 17, 370 N.E.2d at 523. Specifically, the court noted, "[t]he sole limitation to the above general rule is that where it is shown the employee's health has so deteriorated that any normal daily activity is an overexertion, or where it is shown that the activity engaged in presented risks no greater than those to which the general public is exposed, compensation will be denied." *Id*. at 18, 370 N.E.2d at 523. In this case, the Commission, citing the above limitation, concluded that claimant's injuries were not compensable because his "degenerated lumbar discs gave way with the simple act of bending forward" which "demonstrate[d] that his lumbar condition was so deteriorated that any activity of normal life was sufficient to cause [his] spine to break down further."

¶ 47        Based on our review of the record, we find the manifest weight of the evidence shows that claimant's health was not so deteriorated that any normal daily activity would constitute "an overexertion." Initially, we note that the employer presented no evidence which established claimant's back condition was so deteriorated that any normal daily activity would have caused the disc herniation at L4-5. The lack of evidence on this matter is understandable

because the employer did not advance this theory before the Commission. During arbitration, the closest evidence provided that would support the Commission's finding on this issue was during Dr. Butler's deposition when he testified, hypothetically, that a herniated disc could result from bending over to pick up a bolt in a person whose "spine [was] in the condition that [claimant's] spine was in." On cross-examination, Dr. Butler testified that a herniated disc could result under the above described circumstances, however, he stated, "[i]t depends on how he bent over, how often that happened. I mean, anything is possible, sure. But I don't know. It's hard to say." Dr. Butler did not specifically testify as to the type or extent of the degenerative changes in the hypothetical patient's lumbar spine or suggest that claimant's back was similarly degenerated prior to his work injury in May 2009. On the other hand, the evidence established that while claimant had suffered a previous back injury in 2003, that injury had been successfully treated using conservative modalities. Until the time of the injury at issue here, claimant worked on the assembly line five days per week, 10 hours per day and he had not missed any significant amount of time from work between his 2003 injury and the May 2009 injury. Further, there is no evidence in the record that claimant sought treatment for any low back or right hip issues between his 2003 injury and the May 2009 injury or that he suffered any low back or right hip discomfort whatsoever in that timeframe.

¶ 48        Although we are reluctant to set aside the Commission's decision on a factual question, we will not hesitate to do so when, the clearly evident, plain, and indisputable weight of the evidence compels an opposite conclusion. *Potenzo v. Illinois Workers' Compensation Comm'n*, 378 Ill. App. 3d 113, 119, 881 N.E.2d 523, 529 (2007). Here, the Commission's finding that claimant's lumbar spine had deteriorated to the point of collapse prior to his May 2009 accident is against the manifest weight of the evidence.

¶ 49                    III. CONCLUSION

¶ 50        For the reasons stated, we reverse the circuit court's judgment confirming the

Commission's decision, reverse the Commission's decision, and reinstate the decision of the

arbitrator.

¶ 51        Judgment reversed, and arbitrator's decision reinstated.