# Illinois Official Reports

## Appellate Court

---

**Johnston v. Illinois Workers' Compensation Comm'n, 2017 IL App (2d) 160010WC**

---

| | |
|---|---|
| Appellate Court Caption | KEVIN JOHNSTON, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION (The East Dundee Fire Protection District, Appellee). |
| District & No. | Second District<br>Docket No. 2-16-0010WC |
| Filed<br>Rehearing denied | April 13, 2017<br>June 12, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 15-MR-736; the Hon. David R. Akemann, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Timothy D. O'Neil, of Foote Mielke Chavez & O'Neil, LLC, of Geneva, for appellant.<br><br>William B. Isaly, of Ancel Glink Diamond Bush DiCianni & Krafthefer, PC, of Naperville, for appellee. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Hoffman, Hudson, and Moore concurred in the judgment and opinion.<br>Presiding Justice Holdridge dissented, with opinion. |

**OPINION**

¶ 1    On February 25, 2014, claimant, Kevin Johnston, filed an application for adjustment of claim pursuant to the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2012)), seeking benefits from the East Dundee Fire Protection District (employer). He alleged he suffered injuries to his person "while shoveling snow in [the] fire department parking lot." Following a hearing, the arbitrator denied benefits under the Act, finding the employer had successfully rebutted the presumption under section 6(f) of the Act (820 ILCS 305/6(f) (West 2012)) that claimant's heart or vascular disease or condition arose out of his employment as a firefighter and, further, that claimant did not suffer accidental injuries that arose out of his employment nor was his current condition of ill-being causally related to the alleged accident. On review, the Illinois Workers' Compensation Commission (Commission) affirmed and adopted the arbitrator's decision. On judicial review, the circuit court of Kane County confirmed the Commission's decision.

¶ 2    On appeal, claimant asserts that the Commission erred in finding the employer had successfully rebutted the statutory presumption found in section 6(f) of the Act. In the alternative, claimant contends that the Commission's finding his heart attack did not arise out of and was not causally related to a work accident was against the manifest weight of the evidence. We affirm in part and vacate in part.

¶ 3                                I. BACKGROUND

¶ 4    The following evidence relevant to this appeal was elicited at the July 14, 2014, arbitration hearing.

¶ 5    Claimant testified he was 43 years old and had been employed by the employer as a full-time firefighter, in various ranks, since 1999, most recently as a lieutenant. As a full-duty firefighter, claimant worked shifts of 24 hours on and 48 hours off, with each 24-hour shift beginning and ending at 6 a.m. Claimant explained that regardless of his rank, he always had full firefighter duties which included "responding on calls, dealing with structure fires, ceiling detectors, fire alarms[,] *** auto accidents, patient care, [and] mitigating the hazards."

¶ 6    Claimant denied any knowledge of having a heart condition, heart disease, or hypertension prior to February 5, 2014. He testified that he smoked 1 to 1½ packs of cigarettes per day since the 1990s, but in January 2014, he started smoking an electronic cigarette, which uses liquid nicotine, in an attempt to quit smoking. In February 2014, claimant weighed approximately 265 pounds and stood six feet, one inch, tall.

¶ 7    Claimant testified he drove a diesel pickup truck as his personal vehicle and, in the winter, he parked his truck next to the fire department's "back garage" so he could plug the truck's engine block heater into an electrical outlet. If a parking spot next to the garage was not available when he arrived at work, he would park wherever a spot was available, and once a spot opened up by the garage, he would move his truck.

¶ 8    Claimant further testified that when snow was on the ground, the firefighters on duty would remove the snow from the sidewalks, parking lot, and driveway with shovels and snowblowers, which were provided by the employer and stored in the fire department's

garage. According to claimant, it was not uncommon for him to clear snow by himself, although often a group of firefighters worked together to clear the snow.

¶ 9    Claimant testified he reported to work shortly before 6 a.m. on the morning of February 5, 2014. He could not recall what the weather was like that morning. His last memory prior to suffering a heart attack that morning and waking up in the hospital was "talking to one of the guys that was coming off shortly after I got in." He did not recall using a snowblower or a shovel to clear snow that morning. He admitted he could have gone outside to smoke a cigarette that morning, but he could not recall that either.

¶ 10   Claimant underwent emergency quadruple bypass surgery on February 6, 2014. At the time of the arbitration hearing, claimant had just finished 12 weeks of cardiac rehab. He had not yet been released to return to work.

¶ 11   The evidence depositions of four fellow firefighters, Tyler Burd, Ashley Rebou, Jeremy Schwab, and Kanen Terry were introduced into evidence.

¶ 12   Tyler Burd testified he worked for the employer as a firefighter and emergency medical technician (EMT). According to Burd, on the morning of February 5, 2014, claimant walked into the fire station "around 5:59" a.m., which was "unusually late for him." Burd stated that upon entering the building, claimant walked past him on the main floor and proceeded upstairs to the dayroom where he sat down and spoke with Lieutenant Parthun for "about half an hour or so." Burd testified that after the two had finished their conversation, Lieutenant Parthun told Burd that claimant "was going outside to shovel around his car." According to Burd, there was approximately three to four inches of snow on the ground that morning. Approximately 10 minutes after Lieutenant Parthun had mentioned claimant was going outside to shovel snow, Burd looked out the back door and saw claimant lying facedown at the south end of the garage. He ran over to claimant, rolled him over, and found he did not have a carotid pulse, so he ran inside to call for help and then returned to claimant. Burd testified that Schwab and Rebou rushed out. As Rebou started compressions, Burd ran back inside to get Lieutenant Parthun. Within a few minutes, they had claimant on a backboard and took him into the building where they used a defibrillator and "[b]rought him back to life." They then put claimant in an ambulance and transported him to the hospital. According to Burd, "[t]here was a lot of snow on the ground, so it was a very slow ride" to the hospital.

¶ 13   Burd did not recall hearing a snowblower on the morning of February 5, 2014, but he recalled having seen a snowblower in front of the garage, which was approximately five to six feet from claimant's body. The snowblower had been removed from the garage, and the garage door was closed. Burd recalled seeing claimant's truck and testified that the snow around the truck had been cleared. Burd acknowledged that the spot would have been empty of snow if another vehicle had been parked there overnight. Burd testified that snow removal was regularly done by the firefighters and that "[i]f there's snow on the ground, we removed it."

¶ 14   Burd further testified he knew claimant smoked "quite a bit" or "at least two packs a day." According to Burd, claimant would typically smoke out by the garage. He also testified that claimant was "not the healthiest eater," as he often observed him eating fast food.

¶ 15   Ashley Rebou testified she worked for the employer as a firefighter/paramedic. She was working on the morning of February 5, 2014, and was in the dayroom when claimant came in. According to Rebou, claimant "just sat down" and "[d]idn't say anything," which was unusual, but then she got up and went downstairs to check her "rig" while claimant and

Lieutenant Parthun talked. Shortly thereafter, while she and other firefighters were in the main ambulance, claimant walked past them and went outside. Lieutenant Parthun stopped to talk and told them that claimant "was going out to shovel or get the snow out of his parking spot." Rebou testified that a little later Schwab came in and told them that claimant "was down," so she went outside, checked for a pulse, and started compressions. They later moved him inside. According to Rebou, while outside, she observed a snowblower in front of the garage door, approximately two to three feet from claimant's body.

¶ 16    Jeremy Schwab testified that, on February 5, 2014, he was working for the employer as a firefighter/paramedic. He recalled that claimant arrived to work at 5:59 a.m. He stated it was unusual for claimant to arrive so late. He observed claimant come into the dayroom, and without saying anything to anyone, he "flopped into the recliner as if something—something was off." Schwab stated that around 6:30 or 6:45 a.m., he heard claimant "was outside snow blowing." Shortly thereafter, he responded to Burd's call for assistance and saw claimant facedown in the snow. Schwab recalled seeing a snowblower and testified there was one to three inches of snow on the ground.

¶ 17    Kanen Terry testified he worked for the employer as a firefighter/paramedic. He recalled that claimant arrived to work at approximately 6 a.m. on the morning of February 5, 2014. According to Terry, this was unusually late for claimant, but he stated there was four to six inches of snow on the ground that morning. Later, as Terry was checking the rigs, Schwab ran in and said "[claimant] is down" or "[claimant] coded." Terry testified he went outside and saw claimant on the ground with Rebou "hovering" over him. He then assisted in the resuscitation efforts. Terry did not recall seeing a snowblower or a shovel near claimant's body. However, he did observe that the parking spot where claimant's truck was parked was clear of snow "from line to line," and it looked like someone had removed the snow.

¶ 18    Dr. Christopher Berry, a board certified interventional cardiologist, testified by way of evidence deposition. Dr. Berry first saw claimant on February 8, 2014. He treated claimant postoperatively, managing his cardiac arrhythmia and counseling him on lifestyle modifications, including weight loss, smoking cessation, and diet. According to Dr. Berry, claimant suffered a myocardial infarction of the "demand-related ischemia" type, meaning that "he had severe preexisting coronary artery disease which was aggravated by the activity he was performing."

¶ 19    Dr. Berry testified that, based on his limited research regarding coronary heart disease and its relation to a firefighter's occupational exposure, there appeared to be "an association of cardiac events in firemen that is above and beyond that which would be expected of age-matched controls." Thus, he opined that occupational exposure as a firefighter "can be considered a risk factor" for coronary artery disease. Dr. Berry further testified that claimant suffered additional risk factors for coronary artery disease, including obesity, a family history of coronary artery disease, and a history of smoking. Dr. Berry also stated there was some evidence that claimant was "mildly diabetic" as well. Regarding claimant's smoking, Dr. Berry was unable to recall how many packs of cigarettes per day, or for how long, claimant had smoked.

¶ 20    In Dr. Berry's opinion, an activity, such as snow removal, could trigger a cardiac arrhythmia in a person who suffered from blocked or partially blocked arteries like claimant. However, he stated that acute myocardial infarction does not necessarily have to be provoked by activity and that claimant could have suffered the same ischemic event at rest.

¶ 21    Dr. Dan Fintel, a board certified physician in internal medicine, cardiovascular diseases, critical care medicine, and nuclear cardiology, examined claimant in April 2014 at the employer's request. Dr. Fintel performed a physical examination of claimant and reviewed claimant's medical records. According to Dr. Fintel, claimant reported having no memory of the events leading up to his cardiac arrest, which Dr. Fintel explained was "very common." Dr. Fintel testified claimant suffered from preexisting undiagnosed severe triple vessel coronary disease and the ischemic event experienced by claimant on February 5, 2014, could have been caused by claimant's exposure to cold air alone, regardless of whether he shoveled any snow. Dr. Fintel noted "that any activity on a day in which the ambient temperature was 15 degrees in a cardiac patient can be life threatening or life ending." In addition, based on his review of claimant's medical records, Dr. Fintel believed claimant had suffered a cardiac event, or a silent heart attack, prior to February 5, 2014, of which claimant may not have been aware of.

¶ 22    Dr. Fintel was asked his opinion "as to might or could the ingestion of heightened levels of nicotine delivered by an e-cigarette cause a heart attack in a person with [claimant's] cardiac profile." He responded that "there is emerging evidence that the nicotine in e-cigarettes, similar to the nicotine in conventional cigarettes, can cause cardiac problems in patients." Dr. Fintel further testified that, in the course of his examination, claimant was unable to describe specific dates or days in which he was exposed to smoke, gases, or materials of combustion due to fighting fires. In Dr. Fintel's opinion, the medical treatment claimant received following the February 5, 2014, ischemic event was causally connected to his severe underlying preexisting triple vessel coronary artery disease.

¶ 23    On cross-examination, Dr. Fintel testified that he did not know the dosage of nicotine that claimant was using in his e-cigarette and that it was "speculation as to the impact, if any, of the e-cigarette on the event of February 5, 2014." Dr. Fintel further testified he was unaware of any significance between claimant's occupation, which required him to respond to an average of "300 calls per year," and his coronary artery disease because Dr. Fintel was "unaware of what extent of smoke exposure [claimant] had in [his] fire suppression activities." However, Dr. Fintel acknowledged the existence of a body of literature that has found an increased risk of coronary artery disease in firefighters. Dr. Fintel further testified that claimant had other risk factors for developing coronary artery disease, including a 20-year smoking history, which he felt was "probably the major cause chronically of developing advanced atherosclerosis," and a family history of heart disease. In Dr. Fintel's opinion, "[w]orking as a fireman is not considered to be a regular risk factor for coronary artery disease. It depends on occupational exposure and data that I don't have available to me." He continued, "[i]t could be a risk factor based on what his occupational exposure was, but it is not definitely a risk factor."

¶ 24    Dr. Fintel also authored a report in which he opined that "[claimant's] vocational duties did not cause the underlying disease process *de novo*." During his deposition, Dr. Fintel was asked what he meant by the phrase "*de novo*." He responded, "I was trying to express my opinion that his underlying disease was a direct consequence of his multiple risk factors, the smoking, the family history, his male sex, et cetera, and that work as a fireman was not the cause of his underlying coronary artery disease, that had he been doing another job he would still have experienced progressive and life-threatening coronary disease."

¶ 25    On September 17, 2014, the arbitrator issued his decision in the matter. He found that the employer had successfully rebutted the presumption set forth in section 6(f) of the Act "by showing that [claimant's] preexisting coronary artery disease alone was the cause of the cardiac event on February 5, 2014." The arbitrator "discount[ed] Dr. Berry's opinion that occupational exposure could have played a role in this case, given that there was absolutely no evidence submitted that would quantify or even generally describe the type or frequency of [claimant's] exposure in this regard." He noted, "the evidence overwhelming[ly] shows that [claimant] had multiple risk factors—including the fact that he was obese, had a family history of coronary artery disease, was a long-term and heavy smoker, and was possibly diabetic or prediabetic as well as hypertensive—and that the near fatal cardiac event he subsequently suffered could have happened at anytime and anywhere." The arbitrator further concluded that claimant "was a heart attack waiting to happen, and his employment activities neither aggravated nor accelerated his already severe and highly advanced coronary artery disease." The arbitrator found claimant failed to prove that he suffered accidental injuries arising out of his employment or that his current condition of ill-being was causally related to the alleged accident.

¶ 26    On June 1, 2015, the Commission affirmed and adopted the decision of the arbitrator. (We note that it also erroneously remanded the case "for a determination of a further amount of temporary total compensation or of compensation for permanent disability, if any, pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 399 N.E.2d 1322 (1980).")

¶ 27    On December 22, 2015, the circuit court of Kane County confirmed the Commission's decision.

¶ 28    This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30    On appeal, claimant asserts the Commission erred in finding the employer had successfully rebutted the statutory presumption found in section 6(f) of the Act. In the alternative, claimant contends the Commission's finding his heart attack did not arise out of and was not causally related to a work accident was against the manifest weight of the evidence.

¶ 31                              A. Section 6(f) of the Act

¶ 32    As noted, claimant first asserts the Commission erred in finding the employer had successfully rebutted the presumption found in section 6(f) of the Act. Specifically, claimant contends that the evidence showing he had other risk factors for developing coronary artery disease was insufficient to rebut the presumption that his coronary artery disease arose out of his employment as a firefighter. We will review the Commission's determination that the employer presented sufficient evidence to rebut the statutory presumption under the manifest weight of the evidence standard.

¶ 33    Section 6(f) of the Act provides, in pertinent part, as follows:

    "Any condition or impairment of health of an employee employed as a firefighter, emergency medical technician (EMT), or paramedic which results directly or indirectly from any bloodborne pathogen, lung or respiratory disease or condition, heart or vascular disease or condition, hypertension, tuberculosis, or cancer resulting

in any disability (temporary, permanent, total, or partial) to the employee shall be rebuttably presumed to arise out of and in the course of the employee's firefighting, EMT, or paramedic employment and, further, shall be rebuttably presumed to be causally connected to the hazards or exposures of the employment. *** However, this presumption shall not apply to any employee who has been employed as a firefighter, EMT, or paramedic for less than 5 years at the time he or she files an Application for Adjustment of Claim concerning this condition or impairment with the Illinois Workers' Compensation Commission." 820 ILCS 305/6(f) (West 2014).

¶ 34                     1. *Presumptions and Rebuttable Presumptions*

¶ 35    Because section 6(f) of the Act provides for a rebuttable presumption, we first discuss the legal analysis relevant to the application of such a presumption.

¶ 36    In *Diederich v. Walters*, 65 Ill. 2d 95, 100-01, 357 N.E.2d 1128, 1130-31 (1976), our supreme court considered the effect of rebuttable presumptions and explained as follows:

> "With regard to the procedural effect of presumptions, most jurisdictions in this country follow the rule that a rebuttable presumption may create a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption. However, once evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed. (See 1 Jones, Evidence sec. 3:8 (6th ed. 1972).) The burden of proof thus does not shift but remains with the party who initially had the benefit of the presumption. Consistent with this view, Dean Wigmore states in his treatise on evidence that 'the peculiar effect of a presumption "of law" (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule ***.' (9 Wigmore, Evidence sec. 2491, at 289 (3d ed. 1940).)" (Emphasis omitted.)

¶ 37    The supreme court provided further guidance with regard to rebuttable presumptions in *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 448 N.E.2d 872 (1983). In that case, the court expanded upon its discussion in *Diederich*, noting "[t]he prevailing theory regarding presumptions that Illinois follows and *Diederich* speaks about is Thayer's bursting-bubble hypothesis: once evidence is introduced contrary to the presumption, the bubble bursts and the presumption vanishes." *Id.* at 462, 448 N.E.2d at 877. In other words, once evidence has been presented to rebut the presumption, the metaphorical bubble bursts and the trier of fact must then consider the evidence presented in the case as if the presumption had never existed. *Id.*

¶ 38                     2. *The Amount of Evidence Necessary*
                        *to Rebut the Section 6(f) Presumption*

¶ 39    "The amount of evidence that is required from an adversary to meet the presumption is not determined by any fixed rule." *Id.* at 463, 448 N.E.2d at 877. Generally, "[t]he party

contesting the presumption must come forward with sufficient evidence to support a finding of the nonexistence of the presumed fact." *R.J. Management Co. v. SRLB Development Corp.*, 346 Ill. App. 3d 957, 965, 806 N.E.2d 1074, 1081 (2004). However, in some cases where compelling policy considerations are at issue, the "party attacking a presumption has a greater burden of production than merely producing evidence sufficient to support a reasonable trier of fact's finding as to the nonexistence of the presumed fact." *Id.* (citing Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 302.5, at 88 (8th ed. 2004)). In those cases, "the challenging party must overcome a 'strong' presumption by clear and convincing evidence." *Id.* "The clear and convincing standard requires proof greater than a preponderance but not quite approaching the criminal standard of proof beyond a reasonable doubt." *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519, ¶ 134. "Although this strong presumption commonly arises in fiduciary relationships, it has also been applied in other contexts." *Id.*

¶ 40    In some statutes, which provide for a rebuttable presumption, our legislature has provided specific language regarding the amount of evidence a party contesting the presumption must present. For example, section 11-5.3(c) of the Probate Act of 1975 (755 ILCS 5/11-5.3(c) (West 2014)) provides, "[t]here shall be a rebuttable presumption that a parent of a minor is willing and able to carry out day-to-day child care decisions concerning the minor, but the presumption may be rebutted by a preponderance of the evidence." In contrast, section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2014)) provides that the conviction of any one of a number of listed criminal offenses "shall create a presumption that a parent is depraved which can be overcome only by clear and convincing evidence."

¶ 41    Unlike the above statutes, section 6(f) is silent as to the amount of evidence required to rebut the presumption therein. As such, we must determine, as a matter of statutory construction, whether the rebuttable presumption provided for in section 6(f) falls into the strong or ordinary category, requiring either clear and convincing evidence or merely "some evidence," respectively, to the contrary. Because the task before us is one of statutory interpretation, we employ a *de novo* standard of review. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 317 Ill. App. 3d 497, 503, 739 N.E.2d 1009, 1014 (2000).

¶ 42    "In interpreting the Act, our primary goal is to ascertain and give effect to the intent of the legislature." *Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 524, 844 N.E.2d 414, 418 (2006). "The language used in the statute is normally the best indicator of what the legislature intended," and "[e]ach undefined word in the statute must be given its ordinary and popularly understood meaning." *Gruszeczka v. Illinois Workers' Compensation Comm'n*, 2013 IL 114212, ¶ 12, 992 N.E.2d 1234. "[W]here the statutory language is clear, it will be given effect without resort to other aids for construction." *Id.* However, where a statute is ambiguous, we may consider other sources, including legislative history, to determine the legislature's intent. *Id.* ¶ 17.

¶ 43    Here, after a careful review of section 6(f), we are unable to discern from the language of the Act the amount of evidence necessary to overcome the rebuttable presumption contained therein. Because it could be either clear and convincing evidence or just some evidence to the contrary that is necessary to rebut the presumption, we are unable to apply the statute without looking beyond the Act's language. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 397-98, 789 N.E.2d 1211, 1214 (2003). Accordingly, we consider the legislative history behind section 6(f) to determine the legislature's intent. *Id.*; see also *People v. Rose*, 268 Ill. App. 3d

174, 178, 643 N.E.2d 865, 868 (1994) ("where the language is ambiguous, it is appropriate to examine the legislative history").

¶ 44　　Here, the floor debates on House Bill 928, which enacted section 6(f) of the Act in Public Act 95-316 (eff. Jan 1, 2008), are helpful. During the floor debate, the bill's sponsor, Representative Hoffman, was asked to explain the rationale behind the proposed legislation. He responded as follows:

> "Well, I think the current law, what would happen is a firefighter who has these diseases has to come in and the Workers' Compensation Act only covers you for work-related injuries. So you have to prove that the injury was a result of activities on the job. Many times that's very difficult with these types of diseases to prove. Yet we know over, and over, and over again that it's more likely than not that they were a result of the activities of the firefighter while on the job, because there's a higher incidence of these types of illnesses as a result of that type of employment. So what this does is if you have it you could bring your action, it doesn't mean you're going to get compensated, it doesn't mean you're going to win, it doesn't mean that you have proven beyond any doubt or conclusively that this happened on the job, *it only means that the employer can then come in and bring contrary evidence as to whether or not it happened on the job*." (Emphasis added.) 95th Ill. Gen. Assem., House Proceedings, Apr. 27, 2007, at 68-69 (statements of Representative Hoffman).

Representative Hoffman further explained how the rebuttable presumption would apply to a hypothetical firefighter who developed lung cancer toward the end of his career. He stated that an employer could introduce evidence of the firefighter's smoking history to rebut the presumption that the cancer arose out of his employment as a firefighter. *Id.* at 81. He continued, "[s]o don't think it's conclusive that simply because you have lung cancer, you're going to get compensation of the Worker's Compensation Act. What we're saying is, we'll get you to the hearing. Then the other side can bring in evidence that you smoked for thirty (30) years and therefore, it wasn't a result of the actions taken at work." *Id.* at 82.

¶ 45　　Based on the above legislative history, we find that section 6(f) does not involve a strong rebuttable presumption, requiring clear and convincing evidence. Rather, we conclude that the legislature intended an ordinary rebuttable presumption to apply, simply requiring the employer to offer *some* evidence sufficient to support a finding that something other than claimant's occupation as a firefighter caused his condition.

¶ 46　　　　　　　　　　　3. *Whether the Employer Introduced Evidence*
　　　　　　　　　　　*Sufficient to Rebut the Presumption*

¶ 47　　Here, it is undisputed that at the time of arbitration, claimant suffered from coronary artery disease and was entitled to the benefit of the presumption set forth in section 6(f) by virtue of his 15-plus years of work as a firefighter. The arbitrator found that the employer had rebutted the presumption "by showing that [claimant's] preexisting coronary artery disease alone was the cause of the cardiac event on February 5, 2014." However, this finding by the arbitrator fails to properly frame the presumed fact. The presumed fact here is that claimant's coronary artery disease—not just the cardiac event—arose out of his employment as a firefighter. Thus, the issue before us is whether the evidence introduced by the employer was sufficient to rebut the presumed fact as we have stated it.

¶ 48 Initially, we note that, in applying the section 6(f) presumption here, it is irrelevant whether claimant was performing a work function, *i.e.*, shoveling snow, at the time of his heart attack because, as we have stated, it is claimant's underlying coronary artery disease—which manifested itself at the time of claimant's heart attack—to which the presumption attaches. Further, in order for the presumption to attach, it is immaterial whether a claimant has submitted specific evidence to show his actual level of occupational exposure—he simply must establish he has worked as a firefighter for at least five years. Consequently, the determinative issue here is whether the employer successfully rebutted the presumption that claimant's coronary artery disease arose out of and in the course of his employment.

¶ 49 In that regard, the record shows Dr. Fintel authored a report after examining claimant and his medical records. In considering whether claimant's occupation as a firefighter placed him at risk for premature coronary artery disease, Dr Fintel wrote, "[claimant's] vocational duties did not cause the underlying disease process *de novo*." When asked at his deposition what he meant by the phrase "*de novo*," Dr. Fintel responded, "I was trying to express my opinion that his underlying disease was a direct consequence of his multiple risk factors, the smoking, the family history, his male sex, et cetera, *and that work as a fireman was not the cause of his underlying coronary artery disease, that had he been doing another job he would still have experienced progressive and life-threatening coronary disease.*" (Emphasis added.) Dr. Fintel noted that claimant had multiple risk factors for developing coronary artery disease. In particular, claimant (1) had a 20-year history of smoking 1 to 1½ packs of cigarettes per day, (2) had a family history of heart disease, (3) was possibly "mildly diabetic," and (4) was obese. Dr. Fintel testified that claimant's history of smoking "at least a pack per day" for 20 years leading up to his heart attack was "probably the major cause chronically of developing advanced atherosclerosis."

¶ 50 Dr. Fintel's testimony stands in opposition to the presumed fact that claimant's coronary artery disease arose out of his employment. Given this evidence and that the employer needed only to rebut the section 6(f) presumption by presenting *some* contrary evidence, we find the presumption was rebutted. Accordingly, the Commission's finding on this issue was not against the manifest weight of the evidence.

¶ 51 We address here claimant's assertion that in order to rebut the presumption, the employer had to do more than simply point to other potential causes of his coronary artery disease without first *excluding* occupational exposure as a contributing cause. He cites to case law in support of the proposition that to prove causation, a claimant need only establish his occupational exposure was *a* factor in the resulting condition of ill-being. See *Gross v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100615WC, ¶¶ 22-23, 60 N.E.2d 587. While it is correct that in order to obtain an award of benefits under the Act, a claimant need only prove an employment risk was *a* cause of his condition of ill-being (*Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205, 797 N.E.2d 665, 673 (2003)), we find this basic proposition of law is not applicable in the context of a section 6(f) presumption. Nothing contained in the legislative debates on House Bill 928 indicates the legislature intended that an employer be required to eliminate any occupational exposure as a possible contributing cause of a claimant's condition in order to successfully rebut the presumption that the disease or condition arose out of his employment. Claimant cites no authority in support of this proposition and we decline to so hold. We note that if the

employer is successful in rebutting the section 6(f) presumption, *at that point* the claimant may, if the evidence supports it, assert that his occupational exposure was *a* cause of his condition of ill-being, along the lines of *Sisbro*, thus entitling him to an award of benefits.

¶ 52                                    B. Whether Claimant Suffered a Work Accident

¶ 53      As explained, once a party has successfully rebutted a presumption such as the section 6(f) presumption here, the presumption vanishes and the parties proceed as if the presumption never existed. Accordingly, we now consider claimant's alternative argument that the Commission's subsequent finding that his heart attack did not arise out of a work accident was against the manifest weight of the evidence. It is important to note that, while claimant asserted in his section 6(f) argument above that it was his underlying *coronary artery disease* that presumptively arose out of his employment, he argues in this second part of his appeal that the "*cardiac event*" arose out of his efforts to clear snow in the parking lot that day and that the Commission's finding to the contrary is against the manifest weight of the evidence. Specifically, claimant contends that "[t]he manifest weight of the evidence leads to the conclusion that [he] exited the firehouse into cold air for the purpose of clearing snow and that [he] did engage in the physical activity of clearing snow using a combination of a shovel and/or a snow blower." In other words, in his alternative argument on appeal, claimant does not assert that the manifest weight of the evidence established his occupational exposure over the years was a cause of his underlying coronary artery disease—only that his work activities on the day in question caused the cardiac event. Thus, we will limit our discussion to this argument.

¶ 54      "To obtain compensation under the Act, a claimant bears the burden of showing, by a preponderance of the evidence, that he has suffered a disabling injury which arose out of and in the course of his employment." *Sisbro*, 207 Ill. 2d at 203, 797 N.E.2d at 671. "Both elements must be present at the time of the claimant's injury in order to justify compensation." *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 25, 990 N.E.2d 284. An injury occurs "in the course of employment" when it "occur[s] within the time and space boundaries of the employment." *Sisbro*, 207 Ill. 2d at 203, 797 N.E.2d at 671. An injury "arises out of" employment when "the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Id.*

¶ 55      Whether an injury arose out of and in the course of one's employment is generally a question of fact, and the Commission's determination on this issue will not be disturbed unless it is against the manifest weight of the evidence. *Brais v. Illinois Workers' Compensation Comm'n*, 2014 IL App (3d) 120820WC, ¶ 19, 10 N.E.3d 403. "In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence." *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). "The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion." *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592, 834 N.E.2d 583, 592 (2005). "For the Commission's decision to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result." *Land & Lakes*, 359 Ill. App. 3d at 592, 834 N.E.2d at 592.

¶ 56    Here, the employer does not dispute that claimant's heart attack occurred in the course of his employment. Thus, our focus is limited to whether claimant's heart attack occurred "while [he was] shoveling snow in [the] fire department parking lot" as he alleged in his application for adjustment of claim.

¶ 57    To that end, we note that claimant has no recollection of the events immediately preceding his heart attack. As stated, claimant's last memory prior to suffering his heart attack and waking up in the hospital was "talking to one of the guys that was coming off shortly after I got in." In fact, claimant admitted that, instead of going outside to shovel snow, he could have gone outside in order to smoke a cigarette.

¶ 58    Additionally, the record shows that, while three of claimant's fellow firefighters heard that claimant "was going outside to shovel" or "was outside snow blowing," no one actually heard a snowblower or saw claimant shoveling or blowing snow. Further, although three of the four witnesses recalled seeing a snowblower outside, they could not agree as to the location of the snowblower in proximity to claimant's body. In particular, one witness recalled the snowblower was five to six feet from claimant's body, while another remembered the snowblower being only two to three feet from claimant's body, and yet another did not recall seeing a snowblower at all. Finally, while the record shows that two of the witnesses recalled claimant's parking spot being clear of snow, one of them acknowledged that the spot would have been empty of snow if another vehicle had been parked there overnight. In short, the evidence surrounding claimant's unwitnessed heart attack failed to establish the heart attack arose out of his employment.

¶ 59    Based on our review of the record, we cannot say the Commission's finding that claimant was not removing snow at the time of his heart attack was error. Thus, the Commission's determination that claimant's heart attack did not arise out of his employment was not against the manifest weight of the evidence. Further, even if it could be argued claimant had not confined his manifest weight argument to his heart attack, but had also included the development of his coronary artery disease, we would find the Commission's decision that he did not suffer accidental injuries that arose out of his employment was not against the manifest weight of the evidence. Claimant presented no evidence that *his* occupational exposure contributed to cause *his* coronary artery disease. Instead, Dr. Berry testified only that there existed medical research that *generally* supports a correlation between a firefighter's occupational exposure and the development of coronary artery disease. Dr. Berry did not opine that claimant's occupational exposure contributed to cause his disease. Thus, claimant failed to establish a causal connection existed between his occupational exposure and coronary artery disease.

¶ 60    In closing, we note that, despite denying claimant benefits under the Act, the Commission remanded the matter pursuant to *Thomas*, 78 Ill. 2d 327, 399 N.E.2d 1322. This remand was in error.

¶ 61                                    III. CONCLUSION

¶ 62    For the reasons stated, we vacate the circuit court's decision to the extent it affirmed the Commission's remand of the case, and we vacate the Commission's remand. We otherwise affirm the circuit court's judgment confirming the Commission's decision.

¶ 63    Affirmed in part and vacated in part.

¶ 64    PRESIDING JUSTICE HOLDRIDGE, dissenting.

¶ 65    I dissent. The majority states that, in order to rebut the statutory presumption that the claimant's vascular disease and resulting heart attack were causally related to his employment as a firefighter, an employer must offer some evidence sufficient to support a finding that "something other than [the] claimant's occupation as a firefighter caused his condition." *Supra* ¶ 45. According to the majority, an employer can make this showing (and rebut the statutory presumption) even if it does not "eliminate any occupational exposure as a possible contributing cause" of the claimant's condition. *Supra* ¶ 51. From this premise, the majority concludes that the employer successfully rebutted the statutory presumption in this case by presenting Dr. Fintel's opinions that (1) the claimant's coronary artery disease was a direct consequence of multiple, non-work-related risk factors, including the claimant's smoking history, his obesity, his diabetes, his male gender, and his family history; (2) the claimant's work as a fireman was "not the cause of" his underlying coronary artery disease; and (3) "had [the claimant] been doing another job[,] he still would have experienced progressive and life-threatening coronary disease." (Emphasis and internal quotation marks omitted.) *Supra* ¶ 49.

¶ 66    I disagree. To rebut the presumption, the opposing party must present evidence that is "sufficient to support a finding of the nonexistence of the presumed fact." (Internal quotation marks omitted.) *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 462-63 (1983). Here, the presumed fact is that the claimant's cardiovascular condition and ensuing heart attack were causally connected to his employment as a firefighter. In order to establish such a causal connection under the Act, a claimant must prove that some act or phase of his employment was a causative factor in his ensuing injuries. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592 (2005). A work-related injury need not be the sole or principal causative factor, as long as it was *a* causative factor in the resulting condition of ill-being. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). Even if the claimant had a preexisting degenerative condition that made him more vulnerable to injury, recovery for an accidental injury will not be denied as long as he can show that his employment was also a causative factor. *Sisbro*, 207 Ill. 2d at 205; *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086 (2005). A claimant may establish a causal connection in such cases if he can show that a work-related injury played a role in aggravating or accelerating his preexisting condition. *Mason & Dixon Lines, Inc. v. Industrial Comm'n*, 99 Ill. 2d 174, 181 (1983); *Azzarelli Construction Co. v. Industrial Comm'n*, 84 Ill. 2d 262, 266 (1981); *Swartz*, 359 Ill. App. 3d at 1086.[1] Accordingly, the statutory presumption of causation in this case required the fact finder to presume that the claimant's work as a firefighter was *a contributing cause* of his underlying cardiovascular condition, which caused his heart attack and his ensuing

_____

[1]Similarly, to recover compensation under the Occupational Diseases Act (820 ILCS 310/1 *et seq.* (West 2014)), the claimant must prove that he suffers from an occupational disease that is causally connected to his employment. *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 596 (2005). However, the occupational activity need not be the sole or even the principal causative factor, as long as it is a causative factor in the resulting condition of ill-being. *Id.*; see also *Gross v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100615WC, ¶ 22.

disability. To rebut this presumption, the employer was required to present some contrary evidence suggesting that the claimant's employment was not a contributing cause of his cardiovascular condition.[2] For example, the employer could rebut the presumption by presenting expert opinion testimony that (1) exposure to smoke or toxic fumes while fighting fires is not a risk factor for the claimant's cardiovascular condition or (2) the claimant's particular level of exposure to smoke or toxic fumes on the job did not causally contribute to his cardiovascular condition.

¶ 67    Here, the employer did neither. Instead, it presented Dr. Fintel's opinion that the claimant's coronary artery disease was caused by multiple, non-work-related risk factors and not by his work as a firefighter. In my view, Dr. Fintel's opinion was insufficient to rebut the presumption of causation in this case. Dr. Fintel acknowledged that medical literature has noted an increased risk of coronary artery disease in firefighters, and he conceded that the claimant's work as a firefighter "could be a risk factor" for coronary artery disease depending on his level of exposure to smoke. On cross-examination, Dr. Fintel stated that he was unaware of any connection between the claimant's occupation and his coronary artery disease because he was "unaware of what extent of smoke exposure [the claimant] had in [his] fire suppression activities." Accordingly, Dr. Fintel did not (and could not) rule out the possibility that the claimant's occupational exposure to smoke and toxic fumes was a contributing cause of his coronary artery disease and resulting heart attack.

¶ 68    Given this, Dr. Fintel's opinion that the claimant's coronary artery disease was not causally connected to his work as a firefighter was without foundation and unworthy of credence. Expert opinions "must be supported by facts" (internal quotation marks omitted) (*Gross*, 2011 IL App (4th) 100615WC, ¶ 24) and are only as valid as the facts and reasons underlying them (*id.*; see also *Sunny Hill of Will County v. Illinois Workers' Compensation Comm'n*, 2014 IL App (3d) 130028WC, ¶ 36). The proponent of expert testimony must lay a foundation sufficient to establish the reliability of the basis for the expert's opinion. *Gross*, 2011 IL App (4th) 100615WC, ¶ 24; see also *Sunny Hill of Will County*, 2014 IL App (3d) 130028WC, ¶ 36. If the basis of an expert's opinion is grounded in guess or surmise, it is too speculative to be reliable. *Gross*, 2011 IL App (4th) 100615WC, ¶ 24. Because Dr. Fintel acknowledged that the claimant's employment could be causally related to his coronary artery condition "depending on his level of exposure" to smoke on the job but admitted that he was unaware of the claimant's actual level of exposure to smoke as a firefighter, Dr. Fintel's opinion that the claimant's job was not causally connected to his coronary artery condition was speculative and without foundation. Given the information made available to him, Dr. Fintel could not reasonably conclude that the claimant's employment was not a contributing cause of his coronary artery disease. Moreover, even assuming *arguendo* that the claimant's coronary artery condition was initially triggered solely by personal risk factors such as smoking and obesity (which is not clear from the evidence), Dr. Fintel lacked sufficient information to conclude that the claimant's condition was not *aggravated* or

---

[2]I disagree with the majority's statement that, in order to rebut the presumption, the employer merely needs to present some evidence sufficient to support a finding that something other than the claimant's occupation caused his condition. *Supra* ¶ 45. The presumed fact under section 6(f) is that the claimant's occupation was a contributing cause of his condition of ill-being. An employer cannot rebut this presumed fact merely by pointing to other potentially contributing causes. Rather, it must present evidence sufficient to support a finding that the claimant's employment was not a contributing cause.

*accelerated* by his occupational exposure to smoke and fumes. Because Dr. Fintel's opinion lacked sufficient foundation to support a finding of no causal connection, the employer failed to rebut the statutory presumption in this case. *Franciscan Sisters Health Care Corp.*, 95 Ill. 2d at 462-63.

¶ 69 One final point bears mentioning. In determining that an employer rebuts the section 6(f) presumption by presenting some evidence that "something other than the claimant's occupation as a firefighter caused his condition," the majority relies entirely upon certain comments made by Representative Hoffman during the floor debates on House Bill 928, which enacted section 6(f) in Public Act 95-316 (eff. Jan. 1, 2008).[3] *Supra* ¶¶ 44-45. The majority states that it considered this legislative history because it was "unable to discern from the language of the Act the amount of evidence necessary" to rebut the presumption. In other words, because section 6(f) does not specify a particular quantum or type of evidence required to rebut the presumption, the majority concludes that the statute is ambiguous and in need of clarification by resort to legislative history.

¶ 70 I disagree. Where statutes are enacted or amended after judicial opinions are published, "it must be presumed that the legislature acted with knowledge of the prevailing case law." (Internal quotation marks omitted.) *Burrell v. Southern Truss*, 176 Ill. 2d 171, 176 (1997); see also *Bagcraft Corp. v. Industrial Comm'n*, 302 Ill. App. 3d 334, 339 (1998); *Manago v. County of Cook*, 2016 IL App (1st) 121365, ¶ 22. We must therefore assume that the legislature was aware of and approved the existing common-law standards for overcoming rebuttable presumptions when it enacted section 6(f). See *Burrell*, 176 Ill. 2d at 176. That standard was articulated in *Franciscan Sisters Health Care Corp.* Because section 6(f) does not explicitly announce a different standard, we must presume that the legislature incorporated the common-law standard. *Burrell*, 176 Ill. 2d at 176; see also *Bagcraft Corp.*, 302 Ill. App. 3d at 338 ("[t]he judiciary will not interpret a statute in a manner that will abrogate the common law unless such intent is clearly gleaned from the language of the statute"); *Malfeo v. Larson*, 208 Ill. App. 3d 418, 424 (1990) (a statute "cannot be construed as changing the common law beyond what is expressed by the words of the statute or is necessarily implied from what is expressed"). Accordingly, there is no ambiguity in section 6(f) and therefore no need to consider that section's legislative history. As the majority acknowledges, unambiguous statutes must be construed according to their plain meaning, without resort to legislative history or other aids for construction.[4]

---

[3]As the majority notes, Representative Hoffman was the bill's sponsor.

[4]In my view, the use of legislative history in construing a statute's meaning is often problematic even if the statute is ambiguous. As Justice Scalia noted, "[w]e are governed by laws, not by the intentions of legislators." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring). "[L]egislators do not make laws by making speeches on the floor of the legislative chamber." *Town of the City of Bloomington v. Bloomington Township*, 233 Ill. App. 3d 724, 736 (1992). "They make laws by majority vote on a specifically worded bill that has been read three times before each house and distributed to each legislator." *Id.*; see also Ill. Const. 1970, art. IV, § 8(c), (d). "Neither the disclosed nor undisclosed intent of a legislator *** becomes law; only the bill as it reads when passed becomes law." (Emphasis omitted.) *Town of City of Bloomington*, 233 Ill. App. 3d at 736. Thus, while a court may properly consult dictionaries and other appropriate sources in interpreting the meaning of ambiguous terms contained in a statute, the intent of any individual legislators prior to the enactment of the statute is arguably irrelevant. In any event, statements made by individual legislators during floor

¶ 71    For the reasons set forth above, I would find that the employer failed to rebut the statutory presumption of causation in this case. I would therefore reverse the Commission's decision and remand the matter to the Commission.

---

debates or in committee reports do not necessarily reflect the intent of all of the legislators who ultimately voted to enact the law in question. Some legislators might not have been aware of such statements when they voted. See, *e.g.*, *Krohe v. City of Bloomington*, 329 Ill. App. 3d 1133, 1139 (2002) (Steigmann, J., dissenting). Unless the legislator's statements are included in the language of the statute itself, the statements are not voted upon by the legislators or signed into law by the governor. Only the language of the statute, as passed, could properly convey the "legislature's intent" in passing the statute, assuming that such an intent exists and is legally relevant.